## JELAZA v. UNITED STATES
### No. 5973.

United States Court of Appeals
Fourth Circuit.

Argued Oct. 20, 1949.

Decided Jan. 4, 1950.

Russell T. Bradford and Tazewell Taylor, Norfolk, Va., for appellant.

John P. Harper, Asst. U. S. Atty., Norfolk, Va. (George R. Humrickhouse, U. S. Atty., Richmond, Va., on brief), for appellee.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

Jacob Jelaza was indicted for violations of the Internal Revenue Laws of the United States, 26 U.S.C.A. § 145(b). The first count of the indictment charged that for the year 1943 Jelaza reported a net income of $13,383.15 and paid a tax thereon of $4,385.93, whereas his actual net income for that year was $35,766.85, on which there was a tax due the Government of $16,149.92. The second count of the indictment charged that the appellant reported a net income for the year of 1944 of $15,024.45, and paid a tax thereon of $4,046.24, whereas for that year his actual net income was $51,460.90, on which amount he owed the Government an income tax of $27,585.68. Jelaza entered a plea of not guilty and waived a trial by jury. The District Court of the United States for the Eastern District of Virginia found the appellant guilty on both counts and suspended the imposition of sentence for a period of five years upon condition that the appellant be of uniform good behavior, nor violate any of the laws of the United States or the State of Virginia, and that he pay a fine of $10,-000 on the first count of the indictment and a fine of $10,000 on the second count of the indictment within one year as directed by the Probation Officer. Jelaza has appealed. The only question before us is whether there was sufficient evidence to sustain the District Court's finding of guilt.

The Government introduced testimony which, it claimed, showed that, by using three methods commonly employed in

computing income in cases of this kind, Jelaza's income for the two years in question was:

| "Method of Computation | Net Income | |
|---|---|---|
| | 1943 | 1944 |
| Expenditures Method | $35,766.85 | $51,460.90 |
| Bank Deposits Plus Cash Expenditures | 36,221.83 | 59,704.12 |
| Increases in Net Worth Method | 39,401.22 | 55,617.13" |

These methods have, in many cases, been approved by the courts, and the Government is not required, in order to support a conviction here, to prove with mathematical certainty the precise amount of unreported, taxable income. Halle v. Commissioner, 2 Cir., 175 F.2d 500; Stinnett v. United States, 4 Cir., 173 F.2d 129; Gleckman v. United States, 8 Cir., 80 F.2d 394.

In these (and other similar) cases, the courts have been careful to point out that findings of fraud have been sustained if, but only if, the taxpayer has offered no explanation, or no adequate explanation, of the discrepancies between (on the one hand) expenditures and/or bank deposits and/or increases in net worth and (on the other hand) the amount of income reported by the taxpayer.

Thus, in the Stinnett case, supra, our Court, 173 F.2d at pages 129, 130, mentioned: "A gross discrepancy between bank deposits and gross receipts, *without any adequate explanation by the taxpayer* * * Stinnett could offer no adequate explanation of these gross discrepancies." (Italics added.)

In Halle v. Commissioner, supra, Circuit Judge Dobie, speaking for the Second Circuit, said, 175 F.2d at page 503:

"Against this background, taxpayer and his wife introduced little or no genuine evidence to explain the large sums of money deposited in the bank and brokerage accounts."

In the case before us, the taxpayer did offer an explanation of the alleged unreported income (which we shall discuss later) as being gifts from Mrs. Tish, the mother of taxpayer's wife, and the taxpayer testified that his father had repaid to taxpayer a loan of $6,000.

Unquestionably a very important figure in this case is Mrs. Tish. She lived with the Jelaza's, after she sold her store. Mrs. Jelaza was her only child, the apple of her eye, in whom she reposed the utmost confidence. The Government contends that Mrs. Tish's financial resources could not have been large enough for her to have made the gifts in question to Mrs. Jelaza, that these gifts were not in fact made and that taxpayer, under the guise of these gifts, is concealing, and failing to report, what was actually income taxable to him. Mrs. Tish was illiterate, without the ability to read and write. She kept practically no records and was addicted to such strange practices as keeping substantial sums of money hidden in various places in her little store. Yet she displayed no little business acumen in the conduct of her secondhand clothing business.

Voluminous testimony was introduced on both sides as to the extent of the resources of Mrs. Tish. According to the Government, the resources available to Mrs. Tish up through the taxable years before us, based on her own testimony, did not exceed $79,000; the taxpayer introduced evidence to show that these resources exceeded $102,000. The Government claims that the expenditures made by Mrs. Jelaza out of her mother's assets totalled over $103,000; taxpayer claims that these items should be just over $93,000.

No useful purpose would be served, and it would unduly prolong this opinion, were we to attempt a detailed analysis of the extensive evidence in this case. It seems crystal clear that bonds and real estate were purchased, to both of which title was taken in the joint names of Mr. and Mrs. Jelaza, and there were other expenditures by the taxpayer, which were utterly impossible had the taxpayer's resources been limited·to the income that he reported. This discrepancy is filled, according to taxpayer, by gifts made by Mrs. Tish to Mrs. Jelaza, which inured to the economic benefit of the taxpayer, and the payment by taxpayer's father of the loan of $6,000.

The Government naturally attacked the testimony of the Jelaza's and Mrs. Tish. As to Mrs. Tish, it was shown that she failed to file returns for, and pay, State taxes on her personal property, also any

gift taxes on the gifts to her daughter. Mrs. Tish filed no federal income tax return prior to 1941. Many discrepancies appear in the computations and calculations offered by the taxpayer as to the resources of Mrs. Tish, and the testimony submitted by the taxpayer in this connection is evasive and not conclusive. There is an inherent improbability that Mrs. Tish could have realized, and saved, such large sums of money as those claimed, from operation of a small secondhand clothing store.

Other indications that the Jelaza evidence was, in many respects, contradictory and evasive may readily be found in this voluminous record. For example, in April, 1945, the appellant admitted that he had in the Tish safe deposit box 1943 bonds in the sum of $18,112.50, and he told the Government agent that these were all the bonds that he had. Subsequently the agent got information to the contrary from Chicago, and when he taxed the appellant with it, the latter admitted that he had an additional amount of bonds issued in 1944 in the sum of $17,400. Again, when Jelaza and his wife and the agent went to the box, the wife attempted to slip $1,000 cash found in an envelope in the box into her pocketbook, stating that she did not know what the envelope contained. Later she admitted that she did know that it contained $1,000.

Then, there is the uncertain testimony of Jelaza concerning the sum of $6,000 which he claims he received from his father in repayment of a loan which he made his father in 1927 or 1928. No note or other record of this indebtedness was produced, nor was any record shown of the payment of the loan and there was testimony indicating that before his death in 1945, the father was in an impoverished condition and left no estate for administration after his death.

The existence of large sums of money in cash not deposited in bank but kept in a safe deposit box is a highly suspicious circumstance. It cannot here be explained satisfactorily as the result of the eccentricity of an ignorant old woman, because the evidence is undisputed that Mrs. Jelaza, who worked in her husband's store, had entire charge of her mother's affairs and complete access to the cash and securities, while the taxpayer was an interested party, closely concerned with all these transactions. And the circumstances surrounding these deposits and withdrawals varied quite widely from commonly accepted business practices.

A stronger case against the taxpayer would undoubtedly have been made had the Government proved the precise source of income not reported by the taxpayer; though such a showing is not essential for conviction. The Government did attempt such a showing by proof of the gross receipts from the taxpayer's business and evidence as to the percentage of profit from businesses similar to that conducted by the taxpayer. On the other hand, on behalf of the taxpayer, evidence of a Government agent was introduced to show that the books of taxpayer were, on their face, apparently as well kept as the average of books kept by others in a similar business; an employee of taxpayer testified that, to the best of his knowledge, the sale price of all goods sold by taxpayer were clearly marked and that all sales were run through the cash register, while the Chairman of the local Ration Board testified that, during the tax years in question, no reports or complaints were ever made that taxpayer charged more than the ceiling price for goods which he sold.

The big question in this case is whether the explanation offered by the taxpayer of the large sums of money which he expended was so unsatisfactory that the Court below was justified in rejecting it. This, to a large extent, depends upon the credibility of the witnesses who testified in this case. And questions of credibility are for the Trial Judge who saw and heard the witnesses, not for the Appellate Court. Obviously, the Trial Judge did not believe the explanation by the taxpayer of excess income not mirrored in his tax return. Accordingly, we must here accept the Trial Judge's conclusion and his verdict based upon that conclusion.

No provision is made in the Federal Rules of Criminal Procedure, 18 U.S.C.A., for reviewing the sufficiency of

the evidence to sustain a conviction in any different manner where the trial is had by a judge than where it is by a jury. The case comes to us, therefore, under the rule that the evidence is to be considered in the light most favorable to the Government and that we may reverse only if we can say that there is no substantial evidence to support the verdict. We cannot say that there was no substantial evidence to support the verdict. The judgment of the District Court must, therefore, be affirmed.

Affirmed.