## UNITED STATES v. BOYER.

### No. A-6530.

United States District Court
N. D. West Virginia, Fairmont Division.
March 6, 1953.

See also, 13 F.R.D. 91.

Howard Caplan, U. S. Atty., Fairmont, W. Va., Milford Gibson, Kingwood, W. Va., and H. Clare Hess, Asst. U. S. Attys., Fairmont, W. Va., for the Government.

Russell Furbee, C. Howard Hardesty, Jr., and A. Blake Billingslea, Fairmont, W. Va., for defendant.

WATKINS, District Judge.

The defendant was indicted on three counts under Section 145(b) of the Internal Revenue Code, 26 U.S.C.A. § 145(b), for attempting to defeat and evade a large part of his income taxes for the years 1946, 1947 and 1948 by filing false and fraudulent returns for each year, wherein he knowingly understated his net income and the amount of the tax. It was charged that for the year 1946 he reported a net income of $5,215.13 and a tax of $851.13, whereas his income was $37,855.81 and his tax $16,647.78; and for the year 1947 he reported a net income of $4,981.15 and a tax of $794.06, whereas the income was $37,458.78 and the tax $16,490.30; and for the year 1948 he reported a net income of $5,728.62 and a tax of $840.15, whereas the income was $13,644.45 and the tax $3,140.-18.

After a ten-day trial defendant was found guilty by a jury of all three counts of the indictment. He has now made a motion to set aside the verdict of the jury and to award him a new trial. No exception was taken to the charge of the court which

the defendant says fairly and accurately stated the law governing the case. Neither is there any complaint as to the admission of testimony. Although eight grounds of error are alleged in the written motion for a new trial, in brief and in oral argument the defendant relies on only two points. First, he says there is no credible evidence to support the net worth statement as of the beginning date December 31, 1945, and second, that there is a duplication of assets listed in the government's net worth statement.

The government's case consisted, in part, of net worth statements at the beginning and end of each year, derived from available records, and also oral and written admissions of the defendant to the revenue agents who investigated the case. The defendant and three accountants testified and gave their explanation of the discrepancies between the income reported by the defendant and the much larger income shown by the net worth statements, the admissions made by defendant and the evidence corroborating such net worth statements. Upon this motion for a new trial the sufficiency of the evidence must be viewed in the light most favorable to the United States. Jelaza v. United States, 4 Cir., 179 F.2d 202; Stinnett v. United States, 4 Cir., 173 F.2d 129. If we are to consider the evidence in the light most favorable to the United States, we must look to the evidence offered by the government. An examination of the record shows that there is an abundance of credible evidence to support the government's net worth statement showing the net worth of the defendant at the beginning of the period under examination.

Nearly all of the items shown on the government's net worth statement (Government's Ex. No. 13) were agreed to in writing by the defendant. This written stipulation (Stipulation No. 1) included nearly all of the assets and liabilities of the defendant for each of the years in question, including bank accounts, government bonds, loans and notes receivable, real and personal property. It also included adjustment for living expenses and nontaxable portion of capital gains. This net worth computation had been made by government agents after examination of all available papers and records of the defendant, his bank account, court house records, and interviews with third parties with whom defendant had transacted business: To save the time of producing all this proof (it being necessary to support each item in the net worth computation with evidence before the net worth statement is admitted in evidence), the defendant agreed and stipulated as mentioned above. The important item omitted from the stipulation was the amount of cash on hand at the beginning and end of each of the years 1946, 1947 and 1948. The government's net worth statement showed cash on hand of $7,000 at the beginning of 1946. At the trial defendant testified that he had $45,000 to $55,000 cash on hand on this date, which, if the jury believed to be true, would have explained and accounted for that much of increase in net worth. The government's net worth statement showed an increase in net worth during these three years of $80,-108.61 and unreported taxable net income of $68,634.14.

During the years in question defendant was engaged in the slot machine, pin ball, music machine and pool room business. He also had a source of income from football, basketball and baseball pools, punch boards, and gambling. The slot machines, music machines and pinball machines were placed in various clubs and places of business from which defendant received a percentage of profits.

When the government's net worth statement was introduced in evidence, showing that the amount of cash on hand at the beginning period was $7,000 and was the same at the beginning of each year thereafter, no objection was made by the defendant. Any such objection would not have been well taken, because, prior to its omission, the government had introduced much evidence to support its figure of cash on hand.

Special Agents Hanlon and Ervin both testified that in their initial interview with the defendant on July 18, 1951, at his pool room, an inventory of the safe revealed approximately $7,000 in currency, and that

defendant told them this was money he had been able to accumulate since he had been in business. Hanlon testified that defendant stated: "I've built that $7,000 cash up from 1941", which he said was his operating capital and which he said he had had on hand for a number of years and was built up from December 31, 1941. Defendant denied making these statements.' Special Agent Ervin testified:

"An inventory of the safe revealed approximately $7,000 in currency which Special Agent Hanlon asked Mr. Boyer was that the currency that had been accumulated from the first of January, 1951, up to the date of the interview. Mr. Boyer said no, he said that is the cash that I have been able to accumulate over the years. So in order that there would be no question of cash on hand, in order that the taxpayer would not be taxed on an accumulation of cash, the $7,000 was carried back to being on hand December 31, 1945."

Subsequent examination of such records of the taxpayer as were available, and other evidence hereafter mentioned, corroborated this figure, with the result that defendant on November 19, 1951, signed a written statement setting forth his assets and liabilities as of December 31, 1945, the beginning date, in which statement cash on hand was listed at $7,000. At the same time he signed another financial statement giving his assets and liabilities as of December 31, 1950, in which his cash on hand is listed at $7,000. Defendant also signed a statement giving his assets and liabilities as of December 31, 1941, in which he stated he had no cash on hand. At the same interview he answered certain questions in writing in which he stated that on December 31, 1950, he had $7,000 cash on hand "Accumulated since 1941", and no cash on hand December 31, 1941. All of these statements were signed and sworn to by the defendant in the presence of Brill, his accountant, who had kept his books, and who was present at the conference at the request of the defendant.

At the same interview the defendant signed a written affidavit (Government Ex. No. 11), in which he made the following statement:

"I have gone over the net worth statements determined by the investigation of Special Agent John F. Hanlon and Internal Revenue Agent William Ervin and am in agreement with their findings. I wish to let it be known that the unreported income determined through the agents' investigation resulted in my failure to report gamblings winnings in the year 1945 to 1950 inclusive."

Defendant told the government agents that he played poker, tip boards, and gambled. At the end of the written questions and answers, the following appears:

117. "Is there anything further you care to add to this record? No, except to say that this understatement resulted in my failure to report my gambling earnings."

Both the affidavit and the questions and answers were signed and sworn to by the defendant in the presence of his accountant A. D. Brill, who, on January 15, 1952, signed the following letter, addressed to Agent Hanlon:

"I prepared tax reports for the years 1945 to 1950 inclusive. Sometime during the year 1945, Mr. Boyer employed me to install bookkeeping system for his business. The books and records were maintained by me from information furnished by the tax payer. The said tax returns for the years 1945 to 1950 inclusive were compiled from these records. At no time did I even suspect that the tax payer (Mr. Boyer) was not reporting his correct income. I was very much surprised while attending a conference on November 19, 1951, in which it was learned that Mr. Boyer had failed to report his correct income. Mr. Boyer explained in the conference that this unreported income resulted from his failure in furnishing me with all of his income.

"Very truly yours,
A. D. Brill".

The prior income and earning history of the defendant is especially significant. It corroborates the findings of the government agents as revealed by their testimony and as

set forth in the net worth statements, and shows that the defendant could not possibly have had $55,000 accumulated in cash on January 1, 1946.

1. Defendant's prior earnings were as follows: 1919–1921, Stevenson Wholesale Co., $20 per week; 1921–1925, truck driver, $25 per week; 1926, worked in store, $30 per week; 1928, steel worker, average $30 per week; 1930–1935, worked for fruit company, $12 per week; 1935–1937, no employment; 1937–1939, worked for Millard Arnett, amusement machine operator, $12 per week.

2. In 1942 defendant bought out Millard Arnett for $8,000, of which he admits $6,000 was borrowed. With reference to this purchase he signed a written statement as follows: "I did not have any cash on hand so I am presuming that the $8,000 capital investment consisted of a mixture or combination of borrowed money and sale of war bonds." At the trial defendant testified that when he borrowed this money he had $35,000 to $40,000 cash on hand; that at the end of 1941 he had $25,000 to $30,000 cash on hand; and at the end of 1940 about $23,000 to $30,000 cash on hand. Defendant stated that he kept this cash in dresser drawers at home, at his place of business and in his machines, and other places.

3. He never received any gifts or inheritance.

4. He never filed an income tax return until the year 1940. His income reported since 1940 was as follows: 1941, $6,909.70; 1942, $4,541.11; 1943, $1,163.99; 1944, $4,601.20; 1945, $6,713.49. Total, 1941–1945, inclusive, $23,929.49. In order to corroborate defendant's statement at the trial that he had $45,000 to $55,000 cash on hand on December 31, 1945, the defendant's Exhibit No. 9 was introduced showing that in addition to the total income of $23,929.49 reported in these years, defendant had deducted depreciation aggregating $23,437.51, which added to the reported income would make a total of $47,367 of income available for the years 1941 through 1945. But upon cross-examination, Pearson, one of defendant's accountants, admitted that the uncontradicted evidence in the case showed that in these years the defendant had made expenditures of $52,848.52, or $5,481.52 more than the total reported income plus depreciation.

5. Defendant purchased his first automobile in 1939 on credit and paid for it in installments of $25.74 a month.

6. He produced no record as to his cash on hand on January 1, 1946, making it necessary for the government to secure that information from other sources.

7. On July 18, 1951, he told government agents that his net worth was around $10,000 on January 1, 1942.

Defendant made large expenditures of cash or currency, which he did not keep in any bank, and which cash expenditures were not reflected in his books and records. In 1946, 1947 and 1948, the years under consideration, defendant made expenditures in cash of $76,793.12, whereas he reported a total income for these three years of only $15,924.90. According to his tax returns for these three years he spent in cash $60,868.22 more than he reported as income. Most of these cash expenditures were made in 1946 and 1947. In those two years his cash expenditures were $60,438.12, whereas his reported income for those two years was $10,196.68, or his cash expenditures were $50,241.84 more than his reported income. Almost all of his business was transacted in cash.

Many of the particular expenditures were unusually large to be made in currency. For example: 1946, payment on Haymond property $5,000; advance of $5,000 for improvements Haymond property; real estate purchase $2,800; loan $3,000; loan $2,000. 1947, payment Haymond property $10,000; advance for improvements Haymond property $10,000; loan $2,500; loan $2,171.14.

None of the large cash expenditures mentioned above was reported to his accountant, Brill, who kept his books at the time such expenditures were made, and never appeared on the books in the year made. Cash expenditures which were not recorded in his books were as follows: 1946, $27,800; 1947, $24,671.14; 1948, $355.00. Cash expenditures reported on his books were: 1947, $7,966.98; 1948, $16,000.

Brill did not know of the large cash expenditures for loans, some of which were admitted to be business loans. When the defendant made the statement in Brill's presence that he had not reported all his income, Brill stated to defendant in the presence of the revenue officers: "Mose, if you'd given me all of your income you wouldn't be in the trouble you're now in. * * * Boy, that floored me. * * * I didn't know about those loans."

Defendant's books and records were kept by Brill and were based on information furnished by defendant, and the tax returns were made by Brill from the same source of information. Prior to 1945 there were no records available of defendant's transactions, those records having been lost. There were no records in defendant's books of the large amount of claimed cash on hand. His records were not kept at defendant's place of business where entries could be made daily, but were made from periodic reports by defendant to Brill. Under the evidence there were many opportunities for the defendant to divert his receipts by making loans or other investments out of current receipts and not reporting either the current receipts or the loan to his accountant. Defendant did business in such a manner that he was the only person who would know at any given time of all of his transactions and know the amount of cash on hand at a particular time.

■■■ Failure of the defendant to keep adequate records to reflect his transactions, assets and liabilities so that the revenue agents could ascertain his correct net income is evidence of knowledge, wilfulness and intent, and corroborates the admissions of the defendant as to the amount of cash on hand, and admissions that he did not report all of his income. The same can be said about the unusual use of currency by defendant. Unusual use of cash in business transactions indicates a fraudulent intent. United States v. Jelaza, 4 Cir., 179 F.2d 202. In the Jelaza case, the court, 179 F.2d on page 204, said:

"The existence of large sums of money in cash not deposited in bank but kept in a safe deposit box is a highly suspicious circumstance. '* .* * · And the circumstances surrounding these deposits and withdrawals varied quite widely from commonly accepted business practices."

■■ . It is well settled law that actual knowledge may be inferred from acts of the defendant and such inference may arise from a combination of acts, although each standing alone may seem unimportant. Cooper v. United States, 8 Cir., 9 F.2d 216; Battjes v. United States, 6 Cir., 172 F.2d 1. In the case of Bell v. United States, 4 Cir., 185 F.2d 302, it was held that a large increase in net worth coupled with inadequacy of the records to show fully the transactions of the taxpayer is further evidence of wilful intent.

■■ The magnitude of understatement of income in this case is independent evidence of wilful intent, and corroborates the admissions of defendant as to the amount of cash on hand and his statements that he did not report all his income. Oliver v. United States, 7 Cir., 54 F.2d 48; Cave v. United States, 8 Cir., 159 F.2d 464. The evidence of the government shows that in 1946 defendant reported $5,215.13, or only 15½ per cent of his income of $37,855.81; that in 1947 he reported $4,981.15 or only 13½ per cent of his income of $37,458.78; and that in 1948 he reported $5,728.62 or only 42 per cent of his income.

The defendant denied some of the admissions, and stated that he did not remember making others, and offered evidence to show that he had been sick and was not mentally or physically able to transact business. Brill's evidence for the most part corroborated the testimony of the defendant. He did not deny being a witness to the execution of the various affidavits as to net worth, but stated that he signed only as a witness, not knowing the contents of the financial statements; that the defendant signed the papers after he had been assured by the revenue agents present that there was very little difference in their figures and his figures; and that there was no oath to any of the signed papers. He stated that the paper in which defendant admitted he had not reported all his gam-

bling winnings (Government Ex. No. 11) was read aloud to defendant before defendant signed it and before Brill signed it as a witness.

The defendant based his defense around a net worth statement prepared by his accountants which showed that he had $57,-094.30 cash on hand December 31, 1945. Without any records to show the amount of cash on hand, and in the face of defendant's oral and written admissions, defendant's accountants pursued a most ingenious method. First, the accountants met in the office of defense counsel November 24, 1952, about one week before the date of trial and, upon recommendation of one of the accountants employed for the trial, it was decided to have a "surprise count" of the cash that the defendant then had on hand, and from this figure determine what amount of cash he had on hand December 31, 1945. They called the defendant into the conference and Jackley, the accountant who suggested the idea, describes the procedure as follows:

"We specifically attempted not to inform Mr. Boyer as to what we was going to do. Mr. Boyer came into the office between 3:00 and 3:30, I do not know the exact time, and we sat down at the conference table and we told Mr. Boyer exactly what we wanted. We wanted to count all of his cash, but we also wanted Mr. Brill to go along and we also wanted a disinterested third party to make this cash count with Mr. Boyer and Mr. Brill observing. That was done."

The "surprise" count was made and from this figure the accountants calculated how much cash defendant had on hand at the end of each year back to December 31, 1945. In making the calculation they assumed that the "surprise" count correctly showed the amount of cash defendant had on hand November 24, 1952, and further assumed that defendant had correctly reported to Brill all of his income, and that defendant's tax returns for the years in question had correctly stated his income. The jury evidently did not put much faith in this method of calculating defendant's cash on hand.

There is no merit in the second point relied upon by defendant to the effect that the government's net worth statement contains duplication of assets under the reasoning of the Third Circuit Court of Appeals in United States v. Caserta, 3 Cir., 199 F.2d 905.

In the Caserta case, income was calculated on the "expenditure" method. Checks were drawn on defendant's bank account payable to "cash" totaling $2,850 during 1948 and $742.60 in 1949. These cash withdrawals were added as expenditures in calculating defendant's income. Also included as expenditures were payments of $1900 for a boat, $783.10 to General Motors and many other expenditures. If $100 of the cash withdrawal from the bank account was used to buy the boat there would be a duplication in expenditures, since only one expenditure of $100 was made and defendant would be charged with two expenditures of $100 each. Had the government calculated the income on strictly a net worth basis, the cash withdrawals from bank account would have decreased his bank account and decreased his net worth to the full amount of the withdrawals, and the expenditure for the boat would have increased his net worth accordingly. In other words, the withdrawal from the bank would have been deducted from his assets and the expenditure for the boat would be added to his assets, so that one would balance the other. The cash withdrawal would be credited against the cash expenditure for the boat instead of being added. In the Caserta case that was not done. The government agent was there asked, "In your tax assessment or analysis, then, you did not credit the cash withdrawals against the cash expenditures; is that correct? A. No, sir." This was an admission of following an incorrect method of calculating income.

In this case all withdrawals from bank accounts were credited against expenditures or purchases. Here it does not appear that any check withdrawals were made to "cash", and the defendant does not contend that there is any duplication in the bank account items, all of which were covered by stipulation. He contends that there is.

possible duplication in the $7,000 cash on hand figure for the years 1946, 1947 and 1948. It is urged that the $7,000 cash on hand "could have been used in the making of the loans" in some of the years, in which event the cash on hand should have been diminished to such extent. There is no evidence upon which to base this supposition or possibility.

The defendant admits that if the net worth statement showing $7,000 as the amount of cash on hand at the end of 1946, 1947 and 1948 is true, that there can not possibly be any duplication of assets. As pointed out above in the discussion of proof there is credible evidence to support these figures. Defendant signed affidavit that he had no cash on hand on December 31, 1941, and told the agents that the $7,000 which he had in his safe on July 18, 1951 was an accumulation since 1941. He signed other affidavits that on December 31, 1945, and on December 31, 1950, his cash on hand was the same amount, $7,000. In order to give the defendant the benefit of any doubt, the sum of $7,000 cash on hand was carried back to the beginning of 1946. There were no books or records available to show the amount of cash on hand and the revenue agents proceeded to secure the evidence relating to that matter from all available sources, and from interviewing the defendant himself. They found that his figures of $7,000 were corroborated by other evidence related above. At the trial defendant denied the figures contained in his affidavits and oral statements and testified that on December 31, 1945 he had $45,000 to $55,000 cash on hand. The jury was called upon to resolve these conflicting statements to determine whether the cash on hand was $7,000 or at least $45,000.

To illustrate defendant's contentions, and as an example only, it is now urged that there is some possibility that in 1946, the sum of $1,000 of the $7,000 cash on hand might have been used to make a loan; that there is further possibility during 1946, this $1,000 was not restored to the cash account from current income, in which event the cash on hand at the end of the year should be $6,000 instead of $7,000 as shown on the net worth statement. There is no evidence

to support these suppositions. At the trial defendant said that these loans, amounting to $11,500.00, were made out of money "I had accumulated behind 1946 or 1947 or 1948." this being the cash fund of $45,000 to $55,000 which he testified he had on December 31, 1945.

Under this supposition the defense now urges that the true cash on hand at the end of 1946 would be less than $7,000. If more, it would not help him. At the trial the defense contended that at the end of 1946, he had in excess of $30,000 in cash.

In the Caserta case there was an admission that the bank account had been diminished. Here there is no evidence that the $7,000 cash account was diminished at any time during the year, and certainly no evidence that, if diminished during the year, it had not been replenished from current income prior to the end of the year. The government's evidence is to the effect that the defendant's current income for each of the years 1946 and 1947 exceeded the sum of $37,000, and was sufficient to cover his loans and investments in the respective years, without diminishing his cash on hand. His net assets, after deducting liabilities, increased during the three years from $27,725.16 to $107,833.77. His statement was to the effect that this cash on hand had been "built up" since 1941, not that it had been diminishing. The defendant now urges that the evidence shows that this $7,000 fund was "working capital". At the trial defendant was asked if he did not tell the revenue agents that the $7,000 was "working capital" to which he replied, "I do not think I made those assertions at all, no, sir." He also denied that he told the officers that the $7,000 fund which they had counted, had accumulated since 1941.

The statement of the defendant to the effect that he had been accumulating the $7,000 since 1941; the signed net worth statement that he had no cash on hand on December 31, 1941; the signed net worth statement that the $7,000 was on hand as of December 31, 1945; the signed net worth statement that the $7,000 was on hand December 31, 1950; the undisputed fact that it was on hand on July 18, 1951; plus the other evidence mentioned above, certainly

600

substantiates the government's position that this amount of cash was in the defendant's possession during the years 1946, 1947 and 1948. Government Exhibit No. 13, a net worth computation, shows the defendant's cash on hand for the years 1947 and 1948 at $7,000. This exhibit was introduced into evidence without objection by the defendant. Such net worth statements are competent evidence as to the financial history of the defendant and, considered in conjunction with the above mentioned evidence, were sufficient evidence upon which the jury could find that the defendant had $7,000 cash on hand at the end of each of the years in question.

In Bell v. United States, supra, Judge Soper said [185 F.2d 308]:

"An estimate of the taxpayer's net worth as a means of determining his income is resorted to in the absence of accurate records which it is his duty under the statute to make and to preserve, and by its very nature it is an approximation; but it has been held in this and other jurisdictions to be an appropriate method to support a criminal prosecution under the statute, and the absence of proof of the exact amounts of unreported income is not fatal if there is substantial evidence tending to prove the defendant's guilt beyond a reasonable doubt."

Speaking of the necessity of proving the corpus delicti independently of the confession or admission, in the Bell case Judge Soper said:

"Moreover, the rule does not require that the corpus delicti be completely shown by evidence aliunde defendant's confessions, but admits the confessions where other substantial evidence of the crime is shown, and thereupon both the statements of the defendant and the independent evidence must be taken into consideration by the jury in determining whether guilt is proven beyond a reasonable doubt."

The testimony of the revenue agents and that of the defendant and Brill was in conflict in some respects. The credibility of the witnesses was submitted to the jury.

The issues were factual, clearly for determination by the jury. Since the case was ably argued by counsel, the court did not discuss the evidence, and no exceptions were taken to the court's charge. There is substantial evidence to support the verdict. The motion for a new trial is denied.