**PITTSBURGH PLATE GLASS COMPANY, J. A. Messer, Sr., Galax Mirror Co., Incorporated, and Mt. Airy Mirror Company, Appellants,**

v.

**UNITED STATES of America, Appellee.**

**No. 7585.**

United States Court of Appeals Fourth Circuit.

Argued June 2, 1958.

Decided Oct. 6, 1958.

Certiorari Granted Dec. 15, 1958.
See 79 S.Ct. 289.

Cyrus V. Anderson, Pittsburgh, Pa., (Leland Hazard, Pittsburgh, Pa., James B. Henry, Jr., New York City, W. P. Hazlegrove, Roanoke, Va., George R. Humrickhouse, Richmond, Va., W. A. Dickinson, Roanoke, Va., and Richard C. Packard, New York City, on brief), for appellant Pittsburgh Plate Glass Co.

H. Graham Morison, Washington, D. C., (Samuel K. Abrams, New York City, and Robert M. Lichtman, Washington, D. C., on brief), for appellants Galax Mirror Co., Inc., Mount Airy Mirror Co., and J. A. Messer, Sr.

Daniel M. Friedman, Atty., Dept. of Justice, Washington, D. C. (Victor R. Hansen, Asst. Atty. Gen., Samuel Karp, Raymond M. Carlson and Ernest L. Folk, III, Attys., Dept. of Justice, Washington, D. C., and John Strickler, U. S. Atty., Roanoke, Va., on brief), for appellee.

Before SOBELOFF, Chief Judge, and SOPER, and HAYNSWORTH, Circuit Judges.

SOBELOFF, Chief Judge.

The indictment in this case charged a combination and conspiracy in unreasonable restraint of trade to fix prices for the sale of plain plate glass mirrors to furniture manufacturers in violation of Section 1 of the Sherman Act, 26 Stat. 209 (1890), as amended, 15 U.S. C.A. § 1. All seven corporate and two of the three individual defendants were convicted. Appellants here are three of the convicted corporations, namely, Pittsburgh Plate Glass Company ("PPG"), Galax Mirror Company, Mount Airy Mirror Company; and one of the individuals convicted, J. A. Messer, Sr., chairman of the board of the latter two companies.

### Sufficiency of the Evidence

The first question on this appeal is that raised by PPG. It contends that the evidence was insufficient to sustain the jury's verdict that PPG was a party to the conspiracy.

The proceedings in the District Court reveal the following salient facts. The corporate defendants manufacture plain plate glass mirrors in Virginia and North Carolina and sell interstate to furniture manufacturers. PPG is primarily a seller of plate glass to manufacturers, who produce mirrors by applying silver and protective coatings to one side of the glass. PPG also maintains a warehouse in High Point, North Carolina, where it manufactures and sells mirrors. List prices are uniform in the industry upon the mirrors, which are standardized as to size and shape. The actual selling price, however, is at a discount from the list price. Discounts usually range from 78% and above. Thus, the lower the discount, the higher the price.

In October, 1954, the annual meeting of the Mirror Manufacturers Association

was held at Asheville, North Carolina. Even though PPG was not a member of the Association, its sales manager of plate glass, W. A. Gordon, and several of his assistants, were present in Asheville at that time. Also in Asheville were the appellant Messer and representatives of three of the corporate defendants which were convicted but did not appeal: Robert Stroupe, Kenneth Hearn and Ralph C. Buchan. Also present in Asheville was A. G. Jonas, president of Lenoir Mirror Company, which was not a member of the Association. Neither the Lenoir Company nor Jonas was indicted, and Jonas was the principal prosecuting witness.

Prior to the 1954 convention, there had been a severe price war, the impact of which upon the industry was accentuated by a decline in business. By the fall of that year, however, an up-swing in price was imminent due to a shortage of plate glass coincident with an increasing demand for mirrors by furniture manufacturers.

At Asheville, Messer, meeting with Hearn, Stroupe and Buchan, indicated an intention to raise his prices on mirrors to 78% off list. They telephoned Jonas, informing him that Messer wanted to raise his prices, and that everyone there was in agreement. Jonas expressed disbelief since Messer was well-known in the mirror industry as a price-cutter. Jonas requested that someone relay a message to PPG's Gordon to call him. Jonas testified that his purpose was to learn "if there was any truth in this matter." Gordon replied that "[i]n some of the rooms" he had "heard the fellows saying that they would like to get their prices increased," and although he wasn't trying to tell Jonas what he should do or not do, he thought that Jonas "ought to be getting more for the product than we were getting for" it.

The next day, Jonas, Buchan, Messer and Grady V. Stroupe (president of Stroupe Mirror Company) met at an inn called "The Bluffs" and agreed finally, in Jonas' words, "that 78 per cent was a fair price and we would go along on that basis." In his testimony Jonas stated several times that it was his impression that the increase in price hinged on his assent, and if he "didn't come along, prices wouldn't be raised." Everyone agreed to send out letters around October 29 announcing the increase. Jonas said that he would report the outcome of the meeting to PPG. Accordingly, he reached Sam Prichard, Gordon's assistant, by phone on October 29, and Jonas' testimony was that he told Prichard of the agreement reached at The Bluffs and requested him to notify his superior in PPG, Gordon. Jonas further asserted that in a phone conversation with Prichard on November 1, the latter reported that the message had been conveyed to Gordon. Prichard denied emphatically any such calls from Jonas. The telephone bills of Lenoir Mirror Company, Jonas' employer, showed calls to PPG on the two dates on which Jonas claimed to have talked to Prichard. The telephone bill also showed additional calls to PPG during November.

On November 1, 1954, PPG sent a form letter to its customers announcing a price increase by reducing the discount to 78%. The other manufacturers had sent similar letters on October 29 announcing the identical increase, except Stroupe Mirror Company, whose letter went out on October 30.

■ The jury having found PPG guilty of participation in the conspiracy, the applicable rule in judging the sufficiency of the record to sustain the conviction is to consider it in the light most favorable to the prosecution. We may reverse only if we find that there was no substantial evidence, on the record as a whole to support the verdict. Carneal v. United States, 4 Cir., 1954, 212 F.2d 20; Garland v. United States, 4 Cir., 1950, 182 F.2d 801, 802; Jelaza v. United States, 4 Cir., 1950, 179 F.2d 202, 205. Since conscious parallel business behavior *per se* does not establish a violation of the Sherman Act, 15 U.S.C.A. § 1 et seq., Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., 1954, 346 U.S. 537, 541, 74 S.Ct. 257, 98 L.Ed.

273, affirming 4 Cir., 1953, 201 F.2d 306, proof that PPG announced a price rise identical with that announced almost simultaneously by its competitors was not enough by itself to convict. However, PPG's "conscious parallelism," in light of its apparent close connection with the climax of the conspiracy, reasonably permitted the jury to infer that PPG sent the letters pursuant to an agreement with some or all of the conspirators. The proposition is too elementary to require elaboration, that participation in a criminal conspiracy need not be proved by direct evidence; "a common purpose and plan may be inferred from a 'development and a collocation of circumstances.' " Glasser v. United States, 1942, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680. In light of the facts enumerated, we cannot say that the conviction was without substantial basis.

### Alleged Variance.

The defendants are aggrieved by an alleged variance between the indictment and the proof, which they assert is fatal to the Government's case. The indictment, brought in March, 1957, charged that

"11. Beginning in or about October, 1954, or prior thereto, the exact date being to the grand jurors unknown, and *continuing* thereafter, the defendants * * * have been engaged in a combination and conspiracy in unreasonable restraint of trade. * * *

"12. The aforesaid combination and conspiracy has consisted of a *continuing* agreement, understanding and concert of action among the defendants * * * to stabilize and fix prices * * * by agreeing upon and *applying* in pricing plain plate glass mirrors a uniform discount, the amount of which, from time to time, has been changed by agreement. * * *

"13. *During the period of time covered by the indictment and for the purpose of effectuating and carrying out* the aforesaid combination and conspiracy, the defendants by agreement, understanding, and concert of action *have done things* which are hereinabove charged. * * * " (Emphasis supplied.)

The jury was instructed that a "continuing" conspiracy need not be proved; that the gist of the offense was a common understanding to fix prices; and that the Government need not prove that the agreement was effectuated, but only that the defendants entered into an agreement in violation of law.

 The defendants contend that the charge in the indictment can be satisfied only by proof of a continuing agreement; and further that the trial judge's instructions to the jury limiting the required proof to a showing that a conspiracy was entered into, regardless of its duration, constituted an amendment of the indictment. However, the indictment charges the single crime of conspiracy. The act of conspiring to violate the Sherman Act is an offense, and it is immaterial whether or not the purpose of the conspiracy was ever effectuated. Nash v. United States, 1913, 229 U.S. 373, 378, 33 S.Ct. 780, 57 L.Ed. 1232, and United States v. Trenton Potteries Co., 1927, 273 U.S. 392, 402, 47 S. Ct. 377, 71 L.Ed. 700. Likewise, it need not be proved that the conspiracy continued for the duration charged in the indictment. Cooper v. United States, 5 Cir., 1937, 91 F.2d 195, 198. Evidence that the conspiracy continued would be pertinent in this case only to indicate somewhat that the conspiracy was actually entered into and to help determine the severity of the penalty. Since the agreement itself constituted the offense, the additional allegation in the indictment that the conspiracy was "continuing" did not set forth an essential element of the crime. Disregard of this "continuing" feature was immaterial.

### Rulings on Scope of Evidence

 The defendants, however, claim prejudice from rulings restricting the testimony to a narrower range than the allegedly broad charge in the indictment.

They say that their efforts in preparing for trial were concentrated on defending against a charge of a conspiracy continuing up to the date of the indictment, March, 1957, and that when the trial judge ruled that the requirements of the indictment could be satisfied by proving the acts of October, 1954, and limited the evidence, they were in effect called upon to meet a "totally different case" than they had prepared to defend.

But the defendants in no way were misled, because they knew beyond question that the events of October, 1954, would be involved at the trial. They were not diverted from this essential issue, for they were prepared to meet the Government's case as to this. In no practical sense were they prejudiced.

The defendants prepared a comprehensive study of price fluctations in the industry from 1954 up to March, 1957, the date of the indictment, to show the lack of uniformity in prices, thereby suggesting that the conspiracy was not carried out. The trial judge, however, ruled that he would limit the testimony on both sides to July 7, 1955, the effective date of a statute increasing the maximum penalty for violations of the Sherman Act from $5,000.00 to $50,000.00. 69 Stat. 282 (1955), 15 U.S.C.A. §§ 2, 3. By this ruling, the court restricted the introduction of the price fluctuation reports to July, 1955. This limitation was for the protection of the defendant, to avoid the possibility of a verdict based upon acts partly before and partly after the change in the penalty provision.

Evidence for the period after July, 1955, was too remote to have significant bearing on the issue of the defendants' participation in the conspiracy in the fall of 1954. Indeed, the defendants did not even avail themselves of the full scope of the judge's ruling, which would have allowed such evidence for the period up to July, 1955. They elected to present a price fluctuation chart only for the month of November, 1954, the month immediately following the Asheville meeting and the announcements of price increases.

The Court's rulings on the scope of the permissible testimony were not erroneous, and the defendants could not conceivably have been prejudiced by them.

## Instructions to Jury

██ The trial court's refusal of a requested instruction that Jonas' testimony should be received with caution in view of the fact that he was an accomplice or conspirator was not error. It has been repeatedly held that while such an admonition is generally desirable, its omission is not necessarily reversible error, Caminetti v. United States, 1917, 242 U.S. 470, 495, 37 S.Ct. 192, 61 L.Ed. 442, Gormley v. United States, 4 Cir., 1948, 167 F.2d 454, 457, Hanks v. United States, 4 Cir., 1938, 97 F.2d 309, 311, 312, for corroboration of an accomplice's testimony is not a requisite to conviction. Caminetti v. United States, supra, Gormley v. United States, supra. Moreover, Jonas' testimony was in many respects corroborated by other witnesses.

The contention that the instructions placed the burden of proof on the defendants and intimated to the jury that the Court believed Jonas is repudiated by the record. The Judge charged the jury that they were "the sole judges of the credibility of the witness and the weight you want to give to their testimony"; that he was "not vouching for [Jonas'] testimony," nor was he a "partisan of Mr. Jonas," and that it was for the Government to "prove * * * guilt beyond a reasonable doubt."

## Grand Jury Testimony

██ After Government witness Jonas had said on cross-examination that his grand jury testimony related "to the same general subject matter" as his testimony in court, the defendants moved for the production of the transcript of his grand jury testimony. In the absence of a preliminary showing of inconsistency between the two versions, the trial judge denied the motion. The defendants at no time requested the Judge to make a preliminary inspection of the transcript to ascertain whether there

was inconsistency. On the contrary, they insist that they, and not the trial judge, are to determine the existence *vel non* of inconsistency. The defendants rely on United States v. Rosenberg, 3 Cir., 1957, 245 F.2d 870, wherein the Court, feeling bound to apply the rule of Jencks v. United States, 1957, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103, to grand jury testimony, held that the transcript should have been delivered directly to the defendant without prior examination by the Judge.

But whatever uncertainty may have existed shortly after the decision in Jencks, it is now clear that the produc- tion of grand jury testimony is not governed by Jencks nor by the subsequent legislation, now 18 U.S.C.A. § 3500,[1] but by the Federal Rule of Criminal Procedure 6(e), 18 U.S.C.A., which vests discretion in the trial court. United States v. Angelet, 2 Cir., 255 F. 2d 383; United States v. Consolidated Laundries Corporation, D.C.S.D.N.Y. 1958, 159 F.Supp. 860, 862, 868; United States v. Spangelet, 2 Cir., 258 F.2d 338. The Jencks case dealt with the production of FBI reports. The legislative history of the recent statute negatives the notion that Congress meant to assimilate the practice with respect to

1. "Sec. 3500. *Demands for production of statements and reports of witnesses*

"(a) In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) to an agent of the Government shall be the subject of subpena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.

"(b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

"(c) If the United States claims that any statement ordered to be produced under this section contains matter which does not relate to the subject matter of the testimony of the witness, the court shall order the United States to deliver such statement for the inspection of the court *in camera*. Upon such delivery the court shall excise the portions of such statement which do not relate to the subject matter of the testimony of the witness. With such material excised, the court shall then direct delivery of such statement to the defendant for his use. If, pursuant to such procedure, any portion of such statement is withheld from the defendant and the defendant objects to such withholding, and the trial is continued to an adjudication of the guilt of the defendant, the entire text of such statement shall be preserved by the United States and, in the event the defendant appeals, shall be made available to the appellate court for the purpose of determining the correctness of the ruling of the trial judge. Whenever any statement is delivered to a defendant pursuant to this section, the court in its discretion, upon application of said defendant, may recess proceedings in the trial for such time as it may determine to be reasonably required for the examination of such statement by said defendant and his preparation for its use in the trial.

"(d) If the United States elects not to comply with an order of the court under paragraph (b) or (c) hereof to deliver to the defendant any such statement, or such portion thereof as the court may direct, the court shall strike from the record the testimony of the witness, and the trial shall proceed unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared.

"(e) The term 'statement', as used in subsections (b), (c), and (d) of this section in relation to any witness called by the United States, means—

"(1) a written statement made by said witness and signed or otherwise adopted or approved by him; or

"(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness to an agent of the Government and recorded contemporaneously with the making of such oral statement. Added Pub.L. 85–269, Sept. 2, 1957, 71 Stat. 595."

grand jury testimony to that made applicable to a witness' statement to the Government. The congressional committee expressly rejected "any interpretation of the Jencks decision which would provide for production of * * * grand jury testimony * * *," and cited the Rosenberg case as a "misinterpretation" of the Jencks decision. Senate Report No. 981, 85th Cong., 1st Sess., 2 U.S.Code Cong. & Adm. News, p. 1861. The practice which has been adopted in respect to the grand jury testimony of a witness does not contemplate the delivery of the transcript to defense counsel without any prior inspection by the Judge. United States v. Spangelet, supra; United States v. H. J. K. Theatre Corporation, 2 Cir., 1956, 236 F.2d 502, 507, 508. The defendants' claim, as broadly presented, is insupportable and was properly overruled. The Court did not exceed the proper limits of the sound discretion vested in it by Rule 6(e).

■■■■■■ For good reasons, rooted in long experience, courts have shielded grand jury proceedings from unnecessary exposure.[2] This tradition of the law is not to be abandoned without clear legislative direction. Section 3500 does not profess to make, and cannot properly be read to require, any alteration in the practice concerning grand jury minutes. Rule 6(e) stands unaffected by recent decisions and legislation. This is not to suggest, however, that in a case of "particularized need" the secrecy of grand jury testimony may not be "lifted discretely and limitedly." United States v. Procter & Gamble Company, decided June 2, 1958, 356 U.S. 677, 78 S.Ct. 983, 987, 2 L.Ed.2d 1077. When the circumstances seem to the Judge appropriate, he may make such inspection without necessarily requiring a prior showing of inconsistency. United States v.

Spangelet, supra. If the Judge finds inconsistency, and deems it in the interest of justice to bring it to the attention of the cross-examiner, he may do so. If merely inconsequential deviations are found, he is not required to provide the cross-examiner a basis for ranging over a wide area of collateral and minute detail.

Even inspection by the trial judge, it must be recognized, has serious drawbacks. It would cast a heavy burden on the trial judge and seriously interrupt the trial for the Judge to attempt to ferret out inconsistencies in a lengthy transcript; he may not be able readily to absorb and evaluate every nuance in an extensive transcript. A further objection is that imposing this task on the Judge as regular procedure would draw him too deeply into the partisan task of preparing the cross-examination. From time to time instances may arise in which it will appear to the Judge wise and just to read the transcript to check a particular point sharply in issue, but the minute examination, during the trial of elaborate grand jury minutes should not be expected of him.

After all, what we are dealing with is a problem of the fair scope of cross-examination, and the sound judicial discretion of the trial judge must be the chief guide. When the subject matter is one as delicate as grand jury testimony, no fixed rule can be formulated. The Judge should not be compelled to inspect in all cases; neither should he indiscriminately refuse, but he should exercise his judgment according to the circumstances. Certainly we could not approve any rule, such as contended for by the defendants here, requiring the automatic delivery of grand jury transcripts to defendants on demand.

The judgment is

Affirmed.

2. The traditional reasons for the secrecy of grand jury proceedings have been frequently stated. They are succinctly set forth in United States v. Rose, 3 Cir., 1954, 215 F.2d 617.