The **ELDER–BEERMAN STORES CORP.**
et al., Plaintiffs-Appellees,

v.

**FEDERATED DEPARTMENT STORES,
INC., Defendant-Appellant.**

Nos. 20716, 20762.

United States Court of Appeals,
Sixth Circuit.

April 11, 1972.

Dennis G. Lyons, Washington, D. C., Bruce L. Montgomery, Norton F. Tennille, Jr., Washington, D. C., John O. Henry, Dayton, Ohio, on brief; William L. McGovern, Arnold & Porter, Washington, D. C., Estabrook, Finn & McKee, Dayton, Ohio, of counsel, for appellant.

Jerome Goldman, Cincinnati, Ohio, Mitchell B. Goldberg, Goldman, Cole & Putnick, Cincinnati, Ohio, of counsel, for appellees.

Before EDWARDS, MILLER and KENT, Circuit Judges.

KENT, Circuit Judge.

This is an appeal from a jury verdict, in an anti-trust case, in favor of the plaintiff, The Elder-Beerman Stores Corp., in the amount of $1,275,097, which was trebled under the statute,[1] and judgment entered in the amount of $3,825,291. Judgment for the plaintiff, The Elder-Beerman Stores Corp., was entered in only one of the two actions submitted to the jury. The first action was commenced on November 27, 1961, and was combined in trial with the second case which was commenced on June 30, 1966. Upon the trial the jury returned a verdict of "no cause for action" in the first case and announced the verdict which has been previously referred to in the second case.

The appeal now before the Court relates only to the verdict for the plaintiff in the second case. The defendants named in the complaint included Federated Department Stores, Inc., Associated Merchandising Corporation (A.M.C.), its wholly owned subsidiary AIMCEE Wholesale Corporation (A.W.C.), and 66 suppliers. The suppliers were severed from the case for the purposes of this trial. Plaintiffs will be referred to as Elder-Beerman, and the defendants as Federated or Rike's.

In the complaint Elder-Beerman made claims against Federated and the other defendants asserting that they had "combined and entered into combinations * · * * to injure and destroy the plaintiff Elder-Beerman * * * as competitors * * * to restrain interstate trade and commerce unreasonably and unlawfully * * * and establish a monopoly of and to attempt to monopolize the department store business in the Dayton, Ohio, area * * *." Before the cases came on for trial all but twelve of the supplier defendants had been dismissed from the case by the plaintiffs. In the complaint plaintiff also asserted that Federated had violated the Robinson-Patman Act,[2] but this

---

1. 15 U.S.C. § 15.

2. 15 U.S.C. § 13.

claim was dropped prior to trial, and the Court submitted the case to the jury solely on the issues of violation of Sections 1 and 2 of the Sherman Act.[3]

The Court stated in ruling upon the defendant's motion for new trial that "there was insufficient evidence to justify damages on any claims under the Clayton Act." However, on this record it appears that any award of damages was by virtue of Section 4 of the Clayton Act[4] for violations of Sections 1 and 2 of the Sherman Act.

Federated since 1959 has been the owner of Rike's, the leading department store in Dayton for many generations. The guiding head of Elder-Beerman and the other plaintiffs was Arthur Beerman who had been in the clothing business in Dayton for a number of years before 1945 when he opened Beerman Stores, Inc. for the sale of general merchandise. Subsequently the (Beerman) business expanded and grew by the opening of new stores and the acquisition of existing stores in the Dayton area. During the period from 1957 through 1965, the years involved in the lawsuits in question, the total sales of the Elder-Beerman Stores grew from $10,440,000 to $33,300,000.

The lawsuit upon which the judgment was based was commenced in 1966, and sought damages for the period commencing with 1962. In 1962 the plaintiffs did a gross business of $26,500,000, and in 1965 a gross business of $33,300,000. The plaintiffs conceded that Federated and its predecessor, the Rike-Kumler Company, were completely unsuccessful in monopolizing the department store business in Dayton.[5] The lawsuits, the first of which was instituted in 1961, were successful in forcing the suppliers, willingly or unwillingly, to sell to Elder-Beerman, since, as stated in plaintiffs' brief, by the time of trial "all but 14 of the supplier defendants had agreed to sell to Elder-Beerman without discrimination and were dismissed from the suit and Elder-Beerman dismissed two other supplier defendants in whom it had lost interest."

Plaintiffs' whole theory of liability was that there was a *conspiracy* between Federated (and/or its predecessor) and the suppliers for the purpose of destroying the plaintiffs' ability to compete on fair terms, and for the purpose of attempting to obtain a monopoly.[5a]

---

3. 15 U.S.C. §§ 1 & 2.

4. 15 U.S.C. § 15.

5. In his closing argument plaintiffs' counsel stated to the Court and Jury, "We contend in this case several things. One, that Federated was trying to get a monopoly of the *conventional department store business in* this area. They didn't succeed but they were trying." (Tr. pg. 13886).

In the brief on appeal plaintiffs-appellees state at page 53:

"Elder-Beerman fortunately was able by Arthur Beerman's genius and use of his capital to prevent Federated from actually achieving a monopoly and eliminating Elder-Beerman as a traditional department store competitor. Evidence was directed at showing Federated's attempt and conspiracy to monopolize even though its objective was not attained."

And further at page 62:

"The charge on monopolization could not have been prejudicial to Federated because the jury was told by plaintiff's counsel that Elder-Beerman did not

claim that Federated had succeeded in achieving a monopoly, as that would have put Elder-Beerman out of business, that fortunately Federated was not successful in its attempt, due to the preventive measures taken by Arthur Beerman."

Thus, it is obvious that the plaintiffs-appellees abandoned any previously claimed theory that the defendant Rike's had obtained a monopoly of the department store business in Dayton.

5a. In order to establish the existence of a conspiracy it is absolutely essential to prove that there was an *agreement* between the named conspirators. "A conspiracy is an *agreement* (or understanding) between two or more parties to do an unlawful thing or to do a lawful thing in an unlawful manner." Words and Phrases, Permanent Edition, Vol. 8A "Conspiracy", pg. 376. (Emphasis supplied).

"The conspiracy is complete on the forming of the criminal *agreement* and the performance of at least one overt act in fur-

## THE CONSPIRACY IN RESTRAINT OF TRADE THEORY

To establish the alleged conspiracy Elder-Beerman relied upon what might be described as the "rimless wheel" theory. It was the theory of Elder-Beerman that having introduced evidence that Rike's, AMC and AWC had used what Elder-Beerman refers to as "coercion" [6] to persuade some suppliers to grant to Rike's the exclusive right to sell the merchandise involved, that Elder-Beerman had, therefore, established a conspiracy and should be permitted to put in evidence proofs in regard to exclusives granted by other suppliers without presenting evidence to show that Rike's had in fact used coercion to persuade such suppliers to grant to Rike's the exclusive right to sell the suppliers' merchandise and thereby include such suppliers as part of the alleged conspiracy. Elder-Beerman offered volumes of hearsay testimony, much of it from its own employees, as to alleged statements supposed to have been made by representatives of suppliers,[7] including some not named as original defendants, which plaintiff claims should be interpreted to mean that the refusal to sell to Elder-Beerman was because of "coercion" on the part of Federated.[7a]

---

therance thereof." (Emphasis supplied). Singer v. United States, 208 F.2d 477, 480 (6th Cir. 1953); Poliafico v. United States, 237 F.2d 97 (6th Cir. 1956); Pinkerton v. United States, 151 F.2d 499, 501 (5th Cir. 1945).

6. The term "coercion" was used by the attorneys for Elder-Beerman and is used in this opinion as describing the claimed course of conduct which Elder-Beerman sought to show Rike's used to cause suppliers to refuse to do business with Elder-Beerman or refuse to continue to do business with Elder-Beerman.

7. As an example the following appears on page 1219a of the Appendix—Volume III, in the testimony of Max Gutmann, Executive Vice-President of Elder-Beerman, in relation to the inability to obtain VanHeusen's shirts.

"And I met there with Mr. Phillips.
Q. Who was with you, if you recall?
A. Mr. Orden and I believe Mr. Jay.
Q. Whom did you meet at the Van-Heusen office? A. Mr. Phillips, both father and son.
Q. Who were they? A. They were the principals of the VanHeusen Company.
Q. Is the name of the company Phillips-VanHeusen? A. That is right.
Q. And tell us what happened there. A. Well, we met in one office and we shook hands, and we proceeded into a conference room, or a larger office, and Mr. VanHeusen—or Mr. Phillips, Sr., and I were walking ahead, and as we approached our chairs, he said, "Well, you know we wouldn't have any problems if it wasn't for Rike's." And just then his father walked in and said, "Hey, son," —his son walked in and said, "Dad don't say that."

And we had a long discussion after that, but we never got the shirts, never got the merchandise.
Q. Now, that is for the budget stores?
A. That is right.
—8837—
Q. Now, up until June 30, 1966, was VanHeusen willing to sell you the VanHeusen shirts for the budget stores? A. No."

7a. A careful reading of the testimony of Kenyon Starling, former ranking official of Rike's, establishes his understanding of the general merchandising policies of Rike's during the time of his employment. However, it should be recognized that Starling at no time testified as to the existence of any specific exclusive-dealing arrangement or agreement. The testimony of Starling might well have been dispositive of the claim of Elder-Beerman that Rike's was attempting to monopolize the department store business in the Dayton area. We are not satisfied that the testimony of Starling was sufficient to establish the existence of any conspiracy which would permit the use of the exception to the hearsay rule relating to statements by a "co-conspirator" particularly in such a case as this where one all-encompassing conspiracy was claimed.

The exception to the hearsay rule has been generally recognized in conspiracy cases, however, the extent of the exception is carefully limited. Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L. Ed. 790 (1940). In Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), the Supreme Court stated at pages 74, 75, 62 S.Ct. at page 467:

"However, such declarations are admissible over the objection of an alleged co-conspirator, who was not present

An examination of the record reveals that there was direct evidence of an exclusive relationship between Rike's and many of the suppliers named as defendants. There was hearsay evidence of the exclusive relationship as to several. On the record before us this Court reaches the conclusion that there was circumstantial evidence of an exclusive arrangement resulting from some "coercion" as to six of the suppliers. There was direct evidence of what might be termed "coercion" as to four suppliers. There was hearsay evidence, primarily from Elder-Beerman employees, in regard to "coercion" in exclusive arrangements as to fifteen suppliers.[8] As to the remaining supplier defendants the basic evidence was that plaintiff claimed there was an exclusive or a refusal to sell to Elder-Beerman. There was also some evidence of an effort by Rike's to obtain an exclusive or a refusal by Rike's to buy from certain suppliers who sold to Elder-Beerman.

Much of the documentary evidence related to the refusal of certain suppliers to sell to Elder-Beerman but little of it could be dignified as setting forth in the correspondence a statement by the supplier that the refusal was because of coercion on the part of Rike's and there was evidence of other reasons for the sales to Rike's including Rike's heavy promotional activity as to lines for which it had an exclusive arrangement. An example of this is Frigidaire refrigerators, manufactured in Dayton. Rike's had an exclusive arrangement for the sale of Frigidaire refrigerators in

when they were made, only if there is proof *aliunde* that he is connected with the conspiracy. Minner v. United States, 10 Cir., 57 F.2d 506; and see Nudd v. Burrows, 91 U.S. 426, 23 L.Ed. 286. Otherwise, hearsay would lift itself by its own bootstraps to the level of competent evidence."

and the limitation on the exception has been carefully adhered to by this Court in Continental Baking Company v. United States, 281 F.2d 137, 152, 153 (6th Cir. 1960).

8. An example of this is found in the testimony of John A. Silvestri, Vice-President and Merchandise Manager of the Bee-Gee Shoe Corp., found at pages 275a and 276a of the Appendix—Volume I.

"A. Well, in the spring of 1962 again at the New York show I also visited Spalding. I met a Mr. Boyd who was the president of the company, and introduced myself to him, told him where I was from and requested the shoes. He said that the salesman in the territory was responsible for the distribution so he introduced me to the salesman—

Mr. Gilliam: Your Honor, may I approach again?

(Discussion off the record.)

*By Mr. Goldman:*

Q. Continue. A. So I was introduced to Mr. Kuhnert and he knew of our operation and our stores, he said, and he told me that they had a long-standing agreement with the Rike-Kumler Company, and that they were the only store in the Dayton, Ohio, area to carry the shoes. And he said that they did a remarkable job with the product and that he knew their feelings, that he wouldn't even consider selling a shoe store, let alone another department store.

So I again visited Mr. Kuhnert with some of our sales people at the Columbus shoe show that year, and he was [1325] very courteous and showed us the shoes and I called him over to the side and again told him, "We have a lot of calls for these shoes in our stores. I think that you are missing a big opportunity not selling us," and he said, "Well, after all, I like to sell shoes and I can well appreciate that you probably do get a lot of calls for the shoes"; but he said, "this isn't the only community we have this agreement with."

He said, "We have the same situation in Columbus, Ohio, with Lazarus and the same thing with Shillito's in Cincinnati." And he says, "You know how these boys are. You don't mess around with them, and I would just shudder to think what would happen if I sold you people the shoes."

And I continued to call on Mr. Kuhnert regularly at each New York show and Columbus show, and we had— In general he was always very courteous to me, and he sort of, I might say consoled me with my problem. I would tell him—I would reiterate on each meeting the—

The Court: Let's ask questions.

*By Mr. Goldman:*

Q. Well, none of these consolation talks or anything of that kind ever resulted in any sale by Spalding to you up until June of '66? A. No, sir."

department stores in Dayton, although they were sold in area appliance stores. It appeared from the evidence that Frigidaire maintained an exclusive arrangement with Rike's and refused to sell to Elder-Beerman because Frigidaire had concluded that if it made its refrigerators available to Elder-Beerman that Rike's would take on additional refrigerator lines, to which it would give substantial promotion, which in the opinion of Frigidaire would result in a definite reduction in the total unit sales of Frigidaire refrigerators in the Dayton area. And again as to Farah Manufacturing Company (maker of men's slacks) there was some evidence, of a hearsay nature, that the refusal to sell such slacks to Elder-Beerman was because of coercion on the part of Rike's. The letter quoted [9] casts quite a different light on this evidence and in fact might be considered sufficient reason for excluding all hearsay testimony as to the alleged coercion of this supplier as not raising a substantial issue for the jury.

In regard to some lines of merchandise there was evidence as to the availability of alternative items. An examination of the record shows that little or no attention was given to the suitability of such alternative lines, failure of proof which this Court considers to be fundamental in the context of this law-

---

9. Exhibit P–11–H, Volume V Appendix, pp. 32–33e.

April 2, 1959
Farah Mftg. Co.
3rd at Cotton
El Paso, Texas
Eph Krupp
I realize the answer as to why we are cutting out several accounts was rather vague the other day. Have a little more time now and would like to explain fully.
Since you are familiar with our situation in Dayton this can prove to be representative of any large city in the territory.
My primary objective in the Dayton is to do the largest volume possible consistent with honest business practices.
Beerman's have a large volume of business in eight stores, one of which is down-town. Their price catogories are consistently one dollar under our best retailing numbers. Their thinking at this time is not to upgrade but to create larger volume by price promotion. If I made an all-out effort to sell Beerman's, it is my considered opinion that the volume would not exceed $15,000.00 a year. At present, they are using Billy the Kid and Levi for their prestige numbers. Incidentally, Beerman's give these people damn little. On the other hand, they give Salant and Salant and other cheap firms a tremendous amount of volume.
While I would like very much to get the $15,000 or so from Beerman's, I would be paying a very dear price for that business. Rike's is the prestige large department store in town. The buyers at Rike's have no wish to tell us what accounts to sell or not to sell. In fact, one of them tells me that's strictly my business. However, the crucial point is this:
Rike's have no wish to be strongly identified with a line that Beerman's or the other cheap stores are carrying. This is not to say that Rike's would not carry the line at all. This is merely to say that Rike's would not lend their whole-hearted co-operation to the FARAH COMPANY . . . under these circumstances. They would probably turn out to be a $15,000 or $20,000 a year account for the store as a whole. Further more, they would rarely if ever advertise the line and would be constantly on the look-out for a good strong brand with which to become identified. On the other hand, if we do not ship Beerman's, Rike's will buy a minimum of $100,000 a year for the store and will be a tremendous aid in selling other fine stores in Dayton, such as Dunhills and the Metropolitan. Furthermore, they will also be instrumental in influencing other fine stores throughout the country to give FARAH all of their co-operation.
Rike's are planning a series of eight (8) ads in the Dayton American—a good paper. These will be co-operative ads which will enhance FARAH'S reputation considerably. If Beerman's were carrying the line these ads would not be run..
If you have any further questions, I'd like to discuss this further at the BAMA Show.
With kindest personal regards, I am
Sincerely,
/s/ Irv
Irv Skolnick
IS : es

suit. As an example: admittedly, Elder-Beerman sold Simmons, Serta and several other lines of mattresses and did a very substantial volume of business in the field. Rike's had an exclusive arrangement for the sale of Stearns & Foster mattresses. There was not a great deal of evidence as to the relative merits of the several mattresses, except that the plaintiff claimed that Stearns & Foster was the pre-eminent mattress sold in department stores. No evidence was offered as to the relative markets served by these several brands of mattresses. We cannot accept the plaintiff's claim that there was a restraint of trade as to the articles involved because of Rike's exclusive arrangements with the suppliers without competent evidence relating to the availability and suitability of alternative lines. The fact that Elder-Beerman desired to sell the lines did not make the articles involved so unique as to eliminate the need for such evidence. Hershey Chocolate Corp. v. Federal Trade Commission, 121 F.2d 968 (3rd Cir., 1941).[10]

The Supreme Court has dealt with the question of exclusive arrangements between supplier and seller as related to a claimed conspiracy in restraint of trade on more than one occasion. In this field there has been laid down a *rule of reason*. Standard Oil Company of New Jersey v. United States, 221 U.S. 1, 66, 31 S.Ct. 502, 55 L.Ed. 619 (1911); Chicago Board of Trade v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683 (1918); Northern Pacific Railway Co., et al. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). We recognize that certain restraints are unreasonable *per se,* United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940) (price fixing); Klor's Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959) (group boycotts); Timken Roller Bearing Co. v. United States 341 U.S. 593, 71 S.Ct. 971, 95 L. Ed. 1199 (1951) (division of markets among competitors). As to those restraints which are not *per se* unreasonable there is a question of the reasonableness of the exclusive arrangements. As stated in Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 416 F.2d 71, 76 (9th Cir., 1969):

"[1, 2] Not every agreement is *per se* "in restraint of trade" within the meaning of section 1. See White Motor Co. v. United States, 1963, 372 U. S. 253, 261, 83 S.Ct. 696, 9 L.Ed.2d 738. Thus, it is well settled that it is not a *per se* violation of the antitrust laws for a manufacturer or supplier to agree with a distributor to give him an exclusive franchise, even if this means cutting off another distributor. See United States v. Arnold, Schwinn & Co., 1967, 388 U.S. 365, 376, 87 S. Ct. 1856, 18 L.Ed.2d 1249; Lawlor v. National Screen Serv. Corp., 1957, 352 U.S. 992, 77 S.Ct. 526, 1 L.Ed.2d 540 [and see 3 Cir., 1959, 270 F.2d 146, 152, and 1956, 238 F.2d 59, 65]; United States v. Columbia Steel Co., 1948, 334 U.S. 495, 522, 524–525, 68 S.Ct. 1107, 92 L.Ed. 1533; Scanlan v. Anheuser-Busch, Inc., 9 Cir., 1968, 388 F.2d 918, 921; Walker Distrib. Co. v. Lucky Lager Brewing Co., 9 Cir., 1963, 323 F.2d 1, 7; Ace Beer Distribs., Inc. v. Kohn, Inc., 6 Cir., 1963, 318 F.2d 283, 286–287; Packard Motor Car Co. v. Webster Motor Car Co., 1957, 100 U.S.App.D.C. 161, 243 F.2d 418; Interborough News Co. v. Curtis Publishing Co., 2 Cir., 1955, 225 F.2d 289, 293; Naifeh v. Ronson Art Metal Works, 10 Cir., 1954, 218 F.2d 202, 206–207; Bascom Launder Corp. v. Telecoin Corp., 2 Cir., 1953, 204 F.2d 331, 334–335; Fargo Glass

---

10. The facts in *Hershey* are readily distinguishable because there was in that case, as stated at page 970 of the opinion, "An *agreement* between Lamont and the three vending machine operators," and as further stated at page 970, "To keep the trade of the three largest vendors, Hershey was forced into a similar arrangement." There was no evidence of any such situation in this case. (Emphasis supplied.)

& Paint Co. v. Globe American Corp., 7 Cir., 1953, 201 F.2d 534, 539–540; Schwing Motor Co. v. Hudson Sales Corp., D.Md., 1956, 138 F.Supp. 899, aff'd per curiam, 4 Cir., 1956, 239 F. 2d 176; United States v. Bausch & Lomb Optical Co., S.D.N.Y., 1942, 45 F.Supp. 387, 398–399, aff'd by an equally divided court, 1944, 321 U.S. 707, 719, 64 S.Ct. 805, 88 L.Ed. 1024. *Cf.* Albrecht v. Herald Co., 1968, 390 U.S. 145, 154, 88 S.Ct. 869, 19 L.Ed.2d 998 (concurring opinion). *See generally* Report of the Attorney General's National Committee to Study the Antitrust Laws 27–29 (1955); Fulda, Individual Refusals to Deal: When Does Single-Firm Conduct Become Vertical Restraint?, 30 Law & Contemp.Prob. 590, 597–98 (1965); McLaren, Territorial and Customer Restrictions, Consignments, Suggested Resale Prices & Refusals to Deal, 37 Antitrust L.J. 137 (1968); Robinson, Providing for Orderly Marketing of Goods, 15 ABA Antitrust Sections 282, 286–88 (1959); Turner, The Definition of Agreement under the Sherman Act: Conscious Parallelism & Refusals to Deal, 75 Harv.L.Rev. 665, 703–05 (1962)."

We are bound to follow the rule laid down by the United States Supreme Court in United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), where in discussing the legality of exclusive territories and some customer limitations imposed upon dealers by a manufacturer, the Court at page 374, 87 S.Ct. at page 1863, said:

"So here we must look to the specifics of the challenged practices and their impact upon the marketplace in order to make a judgment as to whether the restraint is or is not 'reasonable' in the special sense in which § 1 of the Sherman Act must be read for purposes of this type of inquiry."

In discussing the effect of exclusive distribution arrangements in a different context this Court in Ace Beer Distribu-

tors, Inc. v. Kohn, Inc., 318 F.2d 283 (6th Cir., 1963), said at pages 286, 287:

"That, without the results proscribed by the Sherman Act, is not a violation of the Act. A manufacturer has a right to select its customers and to refuse to sell its goods to anyone, for reasons sufficient to itself. United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992. A refusal to deal becomes illegal under the Act only when it produces an unreasonable restraint of trade, such as price fixing, elimination of competition or the creation of a monopoly. United States v. Parke, Davis & Co., 362 U.S. 29, 32, 80 S.Ct. 503, 4 L.Ed.2d 505; Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 340 U.S. 211, 71 S.Ct. 259, 95 L. Ed. 219; Lorain Journal Co. v. United States, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162. The fact that a refusal to deal with a particular buyer without more, may have an adverse effect upon the buyers business does not make the refusal to deal a violation of the Sherman Act. Damage alone does not constitute liability under the Act."

This Court further said at page 287:

"Unless it can be said that the refusal to deal with plaintiff had the result of suppressing competition and thus constituted 'restraint of trade' within the meaning of Section 1 of the Sherman Act, that is no violation of the Act. We do not think that the substitution by Stroh Brewery Company of one distributor for another had this result."

While the *Schwinn* case, *supra*, involved only one manufacturer, yet the language of the Court at page 376 of 388 U.S., at page 1864 of 87 S.Ct., seems appropriate to many of the lines of merchandise involved in this case.

"At the other extreme, a manufacturer of a product other and equivalent brands of which are readily available in the market may select his customers, and for this purpose he may 'franchise' certain dealers to whom, alone, he will sell his goods. Cf. Unit-

ed States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919). If the restraint stops at that point—if nothing more is involved than vertical 'confinement' of the manufacturer's own sales of the merchandise to selected dealers, and if competitive products are readily available to others, the restriction, on these facts alone, would not violate the Sherman Act. It is within these boundary lines that we must analyze the present case."

On this record in the absence of any more substantial evidence of the alternative lines available and their suitability we cannot say that the decision in Hershey Chocolate Corp. v. Federal Trade Commission, 121 F.2d 968 (3rd Cir., 1941) is applicable. Nor is there evidence to bring the situation confronting us within the meaning of Klor's v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 701 (1959).[11]

On this record we are forced to the conclusion that the plaintiff and the trial court treated all the exclusive arrangements existing between the defendant and certain of its suppliers as part of one alleged conspiracy. Certainly, no adequate instructions were given to suggest to the jury that it would be necessary to find a separate conspiracy between Rike's and each named supplier with which it had an exclusive arrangement in order to justify a verdict for the plaintiff.

■ The trial judge relied upon Poliafico v. United States, 237 F.2d 97 (6th Cir., 1956), cert. den. 352 U.S. 1025, 77 S.Ct. 590, 1 L.Ed.2d 597 but in that case the subject of the conspiracy was narcotics and this Court said at page 104 of 237 F.2d:

"All appellants knew of the conspiracy. The suppliers knew that the Po-

liafico group must resell the heroin at a profit; and all associated with Poliafico in the resale of the heroin knew that Poliafico must buy it from suppliers and that the resales must be at a profit."

In other words, by the very nature of the business everyone involved in the alleged conspiracy had to know that other persons would be performing illegal acts in furtherance of the conspiracy. To the same effect are United States v. Tramaglino, 197 F.2d 928 (2nd Cir., 1952); Lefco v. United States, 74 F.2d 66 (3rd Cir., 1934); United States v. Lester, 282 F.2d 750 (3rd Cir. 1960). From these cases it appears that in order to establish such a conspiracy (based upon the "rimless wheel" theory) there must be shown: (1) that there is an overall-unlawful plan or "common design" in existence; (2) that knowledge that others must be involved is inferable to each member because of his knowledge of the unlawful nature of the subject of the conspiracy but knowledge on the part of each member of the exact scope of the operation or the number of people involved is not required, and (3) there must be a showing of each alleged member's participation.

■■ We interpret the "rule of reason" as meaning that the granting of exclusive selling rights or acceptance of such exclusive selling rights, acts which are not prohibited by law[12] unless there is a resulting foreclosure of market alternatives cannot, without proof of such foreclosure, form the basis for a jury verdict that the defendants had entered into a conspiracy to restrain trade. In this case we find that the evidence of the exclusive arrangements between Rike's and the named suppliers was insufficient to establish that Elder-Beerman was foreclosed from market alter-

11. In *Klor's* there was an affirmative finding of a group boycott. This record is totally devoid of any such evidence.

12. 15 U.S.C. § 13.
"*And provided further*, That nothing herein contained shall prevent persons engaged in selling goods, wares, or merchandise in commerce from selecting their own customers in bona fide transactions and not in restraint of trade;"
See also United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919); Ace Beer Distributors, Inc. v. Kohn, Inc., 318 F.2d 283 (6th Cir. 1963).

natives and certainly was insufficient to establish the conspiracy to restrain trade upon which Elder-Beerman based a right to recover.

More applicable to the facts in this case is the decision of the United States Supreme Court in Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). In that case there was evidence of obvious violations of the provisions of the National Housing Act, 12 U.S.C. §§ 1702, 1703, 1715, 1731. Numerous loans were involved and fraudulent activity on the part of a number of persons. In describing the evidence the Court said at pages 754, 755, 66 S.Ct. at page 1243:

> "The evidence against the other defendants whose cases were submitted to the jury was similar in character. They too had transacted business with Brown relating to National Housing Act loans. But no connection was shown between them and petitioners, other than that Brown had been the instrument in each instance for obtaining the loans. In many cases the other defendants did not have any relationship with one another, other than Brown's connection with each transaction. As the Circuit Court of Appeals said, there were "at least eight, and perhaps more, separate and independent groups, none of which had any connection with any other, though all dealt independently with Brown as their agent." [United States v. Lekacas,] 151 F.2d [170] at 172. As the Government puts it, the pattern was "that of separate spokes meeting at a common center," though we may add without the rim of the wheel to enclose the spokes."

While there is much discussion in the *Kotteakos* decision indicating the possibility that such a "rimless wheel" theory might be used in a civil case though not appropriate in a criminal case, yet, because of the nature of the proofs we are forced to the conclusion as stated by the Supreme Court in the *Kotteakos* case at page 769, 66 S.Ct. at page 1250:

> "This view, [i. e. of a single conspiracy] specifically embodied throughout the instructions, obviously confuses the common purpose of a single enterprise with the several, though similar, purposes of numerous separate adventures of like character."

In other words, we recognize that this case was tried against Federated alone without suppliers being involved in the trial. But this could not justify the admission of hearsay evidence for the purpose of accomplishing the inclusion of a supplier as a co-conspirator with Federated without first demonstrating that the supplier in fact had knowledge of the existence of such conspiracy. To permit Elder-Beerman to use the hearsay evidence offered as a foundation for a conspiracy based upon the "rimless wheel" theory results in the offer and acceptance of damage evidence of the nature which will be hereinafter discussed. We, therefore, hold that on this record Elder-Beerman failed to offer sufficient probative evidence to establish the alleged single conspiracy upon which it bases its claim for damages.

Necessarily, since we find the conspiracy in restraint of trade issue inadequately supported, the verdict must fail. Baltimore and Ohio Ry. Co. v. Postom, 85 U.S.App.D.C. 207, 177 F.2d 53 (1949). As stated by this Court in Volasco Products Co. v. Lloyd A. Fry Roofing Co., 308 F.2d 383, 390 (6th Cir., 1962):

> "[5–7] The plaintiff Volasco claims that the 'two issue' rule is applicable in Tennessee and that, if other issues were properly submitted to the jury, there can be no reversal because of an error in the submission of one issue. The plaintiff cites two cases from the Sixth Circuit, in support of this theory. Louisville & Nashville Railroad Company v. Rochelle, 252 F. 2d 730, C.A. 6, and Atlantic Coastline Railroad Company v. Smith, 264 F.2d 428, C.A. 6. These cases are both diversity cases tried in Tennessee where the two-issue rule prevails (Tennessee

Central Ry. Co. v. Umenstetter, 155 Tenn. 235, 291 S.W. 452) and under Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, the District Court must follow the substantive law of the state. Tennessee and Ohio are the only states in the Sixth Circuit to follow this rule. This case is tried under federal law where the 'two issue' rule is not applicable. Wilmington Star Mining Co. v. Fulton, 205 U.S. 60, 78, 79, 27 S.Ct. 412, 51 L.Ed. 708; Baltimore and O. R. Co. v. Reeves, 10 F.2d 329, 330, C.A. 6; Chicago and N. W. Ry. Co. v. Garwood, 167 F.2d 848, 857, C.A. 8; Roth v. Swanson, 145 F.2d 262, 269, C.A. 8."

This conclusion is in accord with the rule laid down by the United States Supreme Court in Sunkist Growers, Inc. v. Winckler & Smith (1962), 370 U.S. 19 at pages 29, 30, 82 S.Ct. 1130, 1136, 8 L.Ed.2d 305:

"Since we hold erroneous one theory of liability upon which the general verdict may have rested—a conspiracy among petitioners and Exchange Lemon—it is unnecessary for us to explore the legality of the other theories. As was stated . . . in Maryland v. Baldwin, 112 U.S. 490, 493, 5 S.Ct. 278, 28 L.Ed. 822 (1884), '[I]ts generality prevents us from perceiving upon which plea they found. If, therefore, upon any one issue error was committed, either in the admission of evidence or in the charge of the court, the verdict cannot be upheld . . . '"

## DAMAGES

Though we find it necessary to reverse the judgment for the plaintiff for the reasons previously stated, yet we feel compelled to discuss the manner in which the damage issue was presented to the jury. At the outset it is clear that successful recovery by a plaintiff in a private antitrust suit requires that such plaintiff establish three elements as necessary predicates to recovery. As stated in Simpson v. Union Oil Company of California, 311 F.2d 764, 767 (9th Cir., 1963):

"[2] It is clear that the private litigant in a suit-charging violation of the antitrust law stands in a different position than the government in an antitrust action. In a government action, there need be present only a violation of the laws and damage to individuals need not be shown. The private litigant must not only show the violation of the antitrust laws, but show also the impact of the violations upon him and damage to him resulting from the violations of the antitrust laws."

Similar language is found in Continental Ore Co. v. Union Carbide and Carbon Corp., 289 F.2d 86, 90 (9th Cir., 1961).

As to the fact of damage issue it was the plaintiff's theory that a department store which is unable to obtain the brands of merchandise demanded by the public will suffer lost sales both in the desired brand and in items which the customers would be likely to purchase because of the customers' presence in the department store to purchase the desired brand. Elder-Beerman established by the evidence that it could not obtain certain brands of merchandise sold to Rike's by the suppliers joined as defendants in this suit and claimed that there were many other brands which it could not obtain. Elder-Beerman took the position that having established these facts it had established the fact of damage. The plaintiff's theory virtually ignored the necessity for proof that comparable alternative brands were not available. An essential element in attempting to establish the fact of damage because of exclusion from a specified source of supply is the lack of an alternative comparable substitute for the desired merchandise. United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967); Hershey Chocolate Corp. v. Federal Trade Commission, 121 F.2d 968 (3rd Cir., 1941); Ace Beer Distributors, Inc. v. Kohn,

Inc., 318 F.2d 283 (6th Cir. 1963). In *Ace Beer Distributors, Inc.* this Court said at page 287:

> "There is no allegation or contention that the beer of other breweries was not just as available in that area after the change in distributors as it was before."

An examination of the evidence in this case discloses that plaintiff's basic theory was that its "desire" for a specific brand of merchandise was sufficient to establish that such brand was thereby rendered unique, and that the withholding of such brand constituted a violation of the antitrust laws. Testimony as to uniqueness was confined primarily to Elder-Beerman employees who testified that in their opinion Elder-Beerman could have done more business if it had had available each and all of the brands which it "desired." There is a lack of independent evidence to establish any factors of uniqueness in the brands in question on any other basis. The record leaves unanswered the question of the availability of comparable alternative brands. It would appear that in Dayton some of the uniqueness of the brands desired by Elder-Beerman resulted from heavy promotional advertising and activity on the part of Rike's, and as previously pointed out the willingness of Rike's to advertise and promote specific brands of merchandise was in certain instances the specific reason for granting to Rike's the exclusive right to sell such brands of merchandise.

While we find it unnecessary to reverse the judgment for the plaintiff on this basis, we do have more than grave doubt as to the substantiality of the evidence offered by the plaintiff to support this aspect of its claim for damages.

■ We also point out that Elder-Beerman offered expert testimony as to the amount of damages which it sustained because of the lack of the brands which it desired. Plaintiffs' expert offered as his theory of the manner in which the amount of damages should be computed certain formulae as to almost all of the 66 "unavailable" brands of merchandise. The basis for the formulae and the ultimate testimony in regard to the alleged loss sustained was information given to the witness by plaintiffs' counsel prior to trial, and not upon the evidence offered and received during the course of the trial. The trial court made no effort to confine such damage testimony to the few lines of merchandise where evidence of a "conspiracy" had in fact been introduced, and permitted the plaintiffs' expert witness to testify as to losses sustained because of lack of availability of the many brands of merchandise which the plaintiff had been unable to purchase for resale in its department stores. The evidence of Elder-Beerman's inability to obtain certain brands of merchandise was offered and received without regard to whether the record showed that the exclusive arrangement barred Elder-Beerman from the market for that type of merchandise because of unavailability of alternative brands. In fact there was substantial evidence to demonstrate that alternative brands were available and were handled by Elder-Beerman. Exclusive arrangements between Rike's and its suppliers related to brands of merchandise and not to type or quality of merchandise.

The formula to which we have made reference was very complicated when described by the witness. In essence the expert's theory was that if Rike's sold "x" per cent of a specified exclusive brand of merchandise then Elder-Beerman could, therefore, have sold the same percentage of the same merchandise had it been able to offer it. After making some adjustments (subtracting a portion for sales of merchandise carried by Elder-Beerman that would not have been made had the specified exclusive brand been available, then adding something for what were termed "peripheral" sales in other departments resulting from the presence of the customer in the store) the expert determined the total amount of lost sales because of unavailability of the exclusive brands and then reached a conclusion as to the loss of profits and

the damage. This theory appears to us to be questionable absent evidence, which we assume should be available, of the effect of sales of such merchandise by stores which had, during the period in question, taken on such lines of merchandise in place of or in addition to alternative brands previously carried.

■ We recognize that the Supreme Court has pointed out on more than one occasion that although proof of the amount of damage in a case such as this may be somewhat uncertain, plaintiff is not precluded from recovery unless the amount of damage is totally speculative. Story Parchment Company v. Paterson Parchment Paper Company, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931); Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946). As pointed out by the Supreme Court in *Bigelow* at pages 264, 265, 66 S.Ct. at page 580:

*"In such a case, even where the defendant by his own wrong has prevented a more precise computation, the jury may not render a verdict based on speculation or guesswork. But the jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly. In such circumstances 'juries are allowed to act upon probable and inferential, as well as direct and positive proof.' Story Parchment Co. v. Paterson Parchment Paper Co., supra, [282 U.S.] 561–564, 51 S.Ct. 248; Eastman Kodak Co. v. Southern Photo Material Co., supra, [273 U.S. 359] 377–379, 47 S.Ct. 400, 71 L.Ed. 684. Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim. It would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain. Failure to apply it would mean that the more grievous the wrong done, the less likelihood there would be of a recovery.*

"The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created. See Package Closure Corp. v. Sealright Co., 2 Cir., 141 F.2d 972, 979. That principle is an ancient one, Armory v. Delamirie, 1 Strange 505, and is not restricted to proof of damage in antitrust suits, although their character is such as frequently to call for its application." (Emphasis supplied.)

To the same effect see Zenith Radio Corporation v. Hazeltine Research, Inc., 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); Elyria-Lorain Broadcasting Co. v. Lorain Journal Co., 358 F.2d 790 (6th Cir., 1966); Arthur Murray, Inc. v. Oliver, 364 F.2d 28 (8th Cir., 1966).

Thus we find ourselves in accord with the statement found in McCleneghan v. Union Stock Yards of Omaha, 349 F.2d 53, 56 (8th Cir., 1965):

"Plaintiff claims too much. * * *. Proof of damage to the public or to others will not without more support a finding of fact of damage caused by defendants' wrongful acts."

## PRETRIAL CONFERENCES

■ The appellant complains that the trial court failed to enter any "pretrial orders" in this case. We are of the opinion that in protracted litigation such as this antitrust case it would be advisable for the trial court to hold one or more formal pretrial conferences, as provided by Rule 16, Rules of Civil Procedure, 28 U.S.C.A. It would appear that formal pretrial orders resulting from such conferences could have substantially reduced the time required to try the case and might well have eliminated some of the time-consuming testimony which was irrelevant to the issues properly before the court. The witnesses, including the plaintiff's expert witness as to damages, could have been confined to the issues before the court and jury and could have been prevented from di-

gressing at length in regard to matters unrelated to the issues, in response to questions both on direct examination and cross-examination.

## CONCLUSION

Because of the result reached the other allegations of error do not require discussion. We anticipate that upon remand the trial court will hold appropriate pretrial conferences and enter orders pursuant thereto which will substantially reduce the time necessary for trial of this case.

The judgment for the plaintiff is reversed and the case is remanded to the District Court for further proceedings not inconsistent with this opinion.

EDWARDS, Circuit Judge (concurring in part and dissenting in part).

The tradition of this court is to seek one opinion wherever it is possible to achieve it without sacrifice of principle by reasonable accommodation to the views of others. In the face of this, I find myself writing still a third opinion in a case wherein my colleagues have already labored earnestly with this lengthy and complex record and the important and difficult factual and legal issues which it presents.

The issues of this case, however, have significance for all American business and for all American consumers likewise. They deal with thus far undetermined conflicts between two major legal concepts. The first is the right of the businessman freely to compete in the market as he desires. The second is the prohibition against monopoly and restraint of trade contained in the antitrust acts.

This is an antitrust suit by one Dayton, Ohio, chain department store (Elder-Beerman) against its older, bigger, and better established chain department store competitor (Rike's). During the litigation period a national chain of department stores (Federated) bought Rike's. It appears that Federated also brought this law suit, for the basic policies and practices Elder-Beerman complains about were standard policies of Rike's which continued under the same managerial personnel after the Federated purchase. The Elder-Beerman complaint alleges that Rike's conspired with various suppliers of department store goods to restrain trade and to monopolize the department store market in the Dayton area. The device alleged to have been employed was the contract for an "exclusive" whereby one supplier of a highly favored "name" brand would supply its goods to Rike's but not to any other store in the Dayton area—or at least not to Elder-Beerman. Elder-Beerman charges that Rike's used its large buying power (and later the much larger buying power of Federated) to coerce suppliers into such agreements by threatening not to buy from them at all unless they complied.

Elder-Beerman, of course, claims damages as a result of the antitrust violations it attributes to Rike's. But, at the outset, it is interesting to note that during all of the period of years in dispute, Elder-Beerman (and Rike's) showed a steady growth in both volume of business and profit.

As I understand my colleagues' position, both believe that the factual record developed in this lengthy six-month trial does not for a variety of reasons support the jury verdict. My colleague, Judge Kent, reaches this result by feeling that there were no proofs of one overall conspiracy, that much inadmissible hearsay was allowed to condition the jury verdict, that the jury was allowed to take into account in computing damages transactions with some suppliers as to which there was no direct proof of any illegal conduct at all on the part of the defendant, and that in the instance where brands were withheld from the plaintiff by agreement between the defendant and the supplier, there was no proof from which damage to plaintiff could be deduced, since plaintiff did not establish that other brands totally satisfactory for marketing were not available as substitutes. He would reverse for

new trial with the restrictions generally inferred above.

My colleague, Judge Miller, on the other hand, feels that the evidence developed at trial on the claim of conspiracy in restraint of trade was inadequate to support any verdict at all; that plaintiff should not have an opportunity to retry this issue, since in his view plaintiff failed to muster appropriate evidence given a fair opportunity to do so in the first trial, and that on remand the only issue which should go to the jury is that pertaining to attempts to monopolize.

Contrary to these positions, I have felt from the beginning of this case that both sides were given an eminently fair trial before an able and competent judge over a six-month period, that the judge's rulings on admission of evidence under the liberal rules which characterize a conspiracy trial were appropriate, that there were proofs from which the jury could have found one overall conspiracy, that the substitute brand issue goes more to the issue of damage than to the issue of liability, and that we should affirm the jury verdict as far as liability is concerned.

As far as the issue of damages is concerned, however, I have found myself from the beginning of this case in agreement with my colleagues as to remand. Plaintiff's principal witness on the damage issue seems to me to have indulged in utterly inadmissible speculation. In addition, I think that defendant was entitled to an instruction to the jury that no damages could be awarded plaintiff as to those exclusives which the jury found to be legal ones unmotivated by any coercive practices on the part of defendant.

The conflict between the two important policies I mentioned above is mirrored quite specifically in the laws of the United States which underlie this litigation. The free enterprise aspect is set forth in 15 U.S.C. § 13 (1970) as follows:

"*provided further*, That nothing herein contained shall prevent persons engaged in selling goods, wares, or merchandise in commerce from selecting their own customers in bona fide transactions and not in restraint of trade: . . ."

The antitrust policies at issue are set forth in the Sherman and Clayton Acts, the applicable provisions of which follow:

Section 1 of the Sherman Act (26 Stat. 209, as amended) provides in relevant part:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade . . . is declared to be illegal. . . ." 15 U.S.C. § 1 (1970).

Section 2 of the Sherman Act (26 Stat. 209, as amended) provides in relevant part:

"Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States . . . shall be deemed guilty of a misdemeanor. . . ." 15 U.S.C. § 2 (1970).

Section 4 of the Clayton Act (38 Stat. 730, as amended) provides in relevant part:

"That any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15 (1970).

### THE CONSPIRACY ISSUE

The major points of disagreement in our panel may be discussed in relation to the question of conspiracy. Judge Miller finds no evidence in this record of any conspiracy at all and Judge Kent believes that while there is testimony from which the jury could have found conspiracy, legally that testimony should be

read as establishing a number of individual conspiracies rather than one overall conspiracy. I believe that there was proof from which the jury could properly have found one overall conspiracy.

Although I did not believe so at the beginning of this case, I am now persuaded that the most useful model for considering the conspiracy is the rimless wheel. According to Elder-Beerman's theory, Rike's was the hub of the conspiratorial wheel and its exclusive suppliers were the spokes. One of the important questions in this case is whether the suppliers (or any of them) agreed with each other, as well as with Rike's, to participate in the conspiracy. My colleagues believe, and I believe, that there was no such evidence in this record. In short, there was no rim to this wheel, or to put it in more conventional antitrust language, there was no proof of a horizontal conspiracy.

It does not seem to me, however, that this fact is fatal either to the immediate result in terms of the jury's liability verdict, or to retrial of this issue.

There are, of course, many instances where in the criminal law a central conspiracy to dispose of contraband goods has been carried out through selling agents (who also did not know each other) who might be regarded as spokes of the conspiratorial wheel. Poliafico v. United States, 237 F.2d 97 (6th Cir. 1956), cert. denied, 352 U.S. 1025, 77 S. Ct. 590, 1 L.Ed.2d 597 (1957); United States v. Tramaglino, 197 F.2d 928 (2d Cir.), cert. denied, 344 U.S. 864, 73 S.Ct. 105, 97 L.Ed. 670 (1952); United States v. Griffin, 176 F.2d 727 (3rd Cir. 1949), cert. denied, 338 U.S. 952, 70 S.Ct. 478, 94 L.Ed. 588 (1950). See also United States v. Kissel, 218 U.S. 601, 607, 31 S. Ct. 124, 54 L.Ed. 1168 (1910); Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).

In a somewhat similar case, Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), the Supreme Court reversed the joint trial of the defendants which occurred after the central figure had pled guilty. Any other result, of course, would have allowed the individual crimes of other persons to be proved to buttress the charge against each defendant. But *Kotteakos* is no precedent for this case. Here the suppliers, the spokes, are not in court at all in the instant trial, and the case proceeds against the central party charged with the conspiracy, the hub of this particular wheel. Even if all of the exclusive contracts which the jury found should have been regarded as individual and separate conspiracies, the result in accumulation of damages would have been the same. Hence, if *Kotteakos* commands division of the total conspiracy into several or many conspiracies (a result which I do not concede) the District Judge's failure to instruct in favor of such separation would be harmless. *See* Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).

This appears to be the first instance of a department store antitrust suit of this general character against another department store. There is little if any settled law on this problem. It appears to be conceded that a supplier can for his own economic purposes unilaterally grant exclusives, so long as the result does not constitute restraint of trade or monopolization. Agreements for such exclusives have been held not to constitute violations of the antitrust laws. But Elder-Beerman contends that it has demonstrated many more instances than in any prior case and with a much greater impact upon the competitive position of the parties.

The real issue of antitrust conspiracy in this case, however, concerns Elder-Beerman's allegations that Rike's restrained competition by compelling exclusives or "containments" by economic retaliation and coercion.

As to this issue appellee Elder-Beerman relies primarily upon Hershey Chocolate Corp. v. F. T. C., 121 F.2d 968 (3d Cir. 1941), and Klor's Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1957). Appellant Federated relies upon Joseph E.

Seagram & Sons, Inc. v. Hawaiian Oke and Liquors, Ltd., 416 F.2d 71 (9th Cir. 1969), cert. denied, 396 U.S. 1062, 90 S. Ct. 752, 24 L.Ed.2d 755 (1970); Packard Motor Car Co. v. Webster Motor Car Co., 100 U.S.App.D.C. 161, 243 F.2d 418, cert. denied, 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed.2d 38 (1957); and United States v. Arnold Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967).

Unfortunately, none of these cases deals with department stores or a situation where a successful retailer was seeking to secure an exclusive dealership.

The essence of the antitrust conspiracy violations charged by Elder-Beerman consists of Rike's using both its and Federated's economic purchasing power to restrain competition by coercing important brand name suppliers into either giving Rike's an exclusive on their most popular merchandise, or at least restricting their sales so as to exclude Elder-Beerman. The proofs before the District Judge and the jury appear to have established a variety of such instances.

At oral argument, Elder-Beerman stated that there were 115 instances where Rike's agreed that it had exclusives, and that there were 50 other instances where under the testimony the jury could have found exclusives. In response Rike's claims most exclusives were the result of suppliers' policies, without suggestion, coercion or conspiracy from Rike's. But Elder-Beerman did present testimony from which the jury could have found coercion in a substantial number of instances. Since the complaint charges conspiracy and restraint of trade, Elder-Beerman argues that the jury was entitled to infer that similar coercive practices happened in the other exclusive arrangements.

I believe (as will be demonstrated) that there was evidence from which the jury could have found that a substantial number of exclusive contracts were the product of Rike's policy of threatening or employing economic coercion against suppliers who resisted requests for exclusives.

The United States Supreme Court discussed such coercion in Simpson v. Union Oil Co., 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964):

There is actionable wrong whenever the restraint of trade or monopolistic practice has an impact on the market; and it matters not that the complainant may be only one merchant. See Klor's, Inc. v. Broadway-Hale Stores, 359 U.S. 207, 213, 79 S.Ct. 705, 3 L.Ed.2d 741; Radiant Burners v. Peoples Gas Co., 364 U.S. 656, 660, 81 S.Ct. 365, 5 L.Ed.2d 358. As we stated in Radovich v. National Football League, 352 U.S. 445, 453–454, 77 S. Ct. 390, 1 L.Ed.2d 456:

"Congress has, by legislative fiat, determined that such prohibited activities are injurious to the public and has provided sanctions allowing private enforcement of the antitrust laws by an aggrieved party. These laws protect the victims of the forbidden practices as well as the public."

\*    \*    \*    \*    \*    \*

We made clear in United States v. Parke, Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505, that a supplier may not use coercion on its retail outlets to achieve resale price maintenance. We reiterate that view, adding that it matters not what the coercive device is. United States v. Colgate, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992, as explained in *Parke, Davis*, 362 U.S., at 37, 80 S.Ct. 503, 4 L.Ed.2d 505 was a case where there was assumed to be no agreement to maintain retail prices. Here we have such an agreement; it is used coercively, and, it promises to be equally if not more effective in maintaining gasoline prices than were the *Parke, Davis* techniques in fixing monopoly prices on drugs. Simpson v. Union Oil Co., *supra* at 16–17, 84 S.Ct. 1051, 1054, 12 L.Ed.2d 98.

Probably the closest case to the facts of this one is Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). There are, of course, important differences in facts as the following discussion makes clear:

> Plainly the allegations of this complaint disclose such a boycott. This is not a case of a single trader refusing to deal with another, nor even of a manufacturer and a dealer agreeing to an exclusive distributorship. Alleged in this complaint is a wide combination consisting of manufacturers, distributors and a retailer. This combination takes from Klor's its freedom to buy appliances in an open competitive market and drives it out of business as a dealer in the defendants' products. It deprives the manufacturers and distributors of their freedom to sell to Klor's at the same prices and conditions made available to Broadway-Hale and in some instances forbids them from selling to it on any terms whatsoever. It interferes with the natural flow of interstate commerce. It clearly has, by its "nature" and "character," a "monopolistic tendency." As such it is not to be tolerated merely because the victim is just one merchant whose business is so small that his destruction makes little difference to the economy. Monopoly can as surely thrive by the elimination of such small businessmen, one at a time, as it can by driving them out in large groups. In recognition of this fact the Sherman Act has consistently been read to forbid all contracts and combinations "which 'tend to create a monopoly,'" whether "the tendency is a creeping one" or "one that proceeds at

full gallop." International Salt Co. v. United States, 332 U.S. 392, 396, 68 S.Ct. 12, 92 L.Ed. 20. Klor's, Inc. v. Broadway-Hale Stores, Inc., *supra* 359 U.S. at 212–214, 79 S.Ct. at 709 (Footnotes omitted.)

Although Elder-Beerman argues it was also a victim of a supplier boycott, for the reasons already stated our panel is in agreement that the facts do not support that conclusion. It seems to me, however, that parallel conduct by suppliers induced by Rike's coercion would just as readily bring into play the principles outlined above as would a horizontal boycott.[1]

Perhaps the easiest way to understand the critical issue upon which this case was tried and which now divides our panel is to quote the testimony of Kenyon Starling, long-time executive vice president of Rike's:

> Q. And you, yourself, at Rike's, had a motto to your merchandisers which can be put in the expression "Be aggressive"? A. Yes, sir.
>
> Q. In fact, that was the one thing you insisted upon on your merchandisers, that they should be aggressive? A. Yes, sir.
>
> Q. Now it is true, is it not, Mr. Starling, that the department-store business is kind of a hard business; if you want to get ahead you have to be pretty hard? A. I would say so, yes.
>
> \* \* \* \* \* \*
>
> Q. Now, in fact, the Beerman Stores when they started going into department stores, because of their aggressive attitude on their part, were something which was of concern to Rike's and you and the other officials,

---

1. We have not found and no one has cited to us a line of testimony which suggests that the exclusive suppliers against whom Elder-Beerman complains consulted with or agreed with each other about anything. Each did, of course, consult with Rike's. Some agreed to grant exclusives to Rike's under the threat of being denied its business. And doubtless the jury could have found that each of these

salesmen in the Dayton area knew that the same thing was happening to others. It may be that this is all that is needed to constitute a horizontal boycott. But to this point no case appears to have gone this far. *But see* United States v. O'Connell, 165 F.2d 697 (2d Cir. 1948). Like my colleagues, I am inclined to feel that *more is needed than this to supply* a rim for this wheel.

because you watched any aggressive competitor; isn't that true, sir? A. Yes. We watched all aggressive competitors.

Q. And at that time it is also true, is it not, that you were sure that there were pressure methods used on various suppliers, and that these methods may have been expressed or implied for the purpose of obtaining exclusivity, as this was a common practice by all leading retailers? A. Pressure in that case was your word, and I agreed to it, Mr. Goldman.

\* \* \* \* \* \*

Q. And it is also true, is it not, from your own experience at Rike's, that buyers are apt to be stronger in certain methods than perhaps they should be, in order to aggrandize their own departments and to make a good profit for their departments and thereby to secure advancement for themselves? That's true, is it not? A. It is.

Q. That's a fact of human nature, isn't it? A. Very definitely.

Q. And the buyers were given a certain amount of freedom in how they were to handle their departments; isn't that true? A. To a minor degree.

\* \* \* \* \* \*

Q. And it was also true, Mr. Starling, was it not, that as management at Rike's you were aware of certain strong tactics, which you did not require, but which you did not object to, because of the authority given to the buyers? A. Yes, I think that's true.

Q. And you who were in charge of all the merchandisers would have had the authority to stop anything that was wrong, wouldn't you, sir? A. Yes, I would.

Q. And as far as you were concerned, you were willing to let these buyers continue to use these strong tactics that you were aware of, isn't that right? A. Yes.

\* \* \* \* \* \*

Q. It is also true, is it not, Mr. Starling, that the Rike people were aware of Beerman's, as you considered it, price cutting and underselling tactics, and were familiar with what such tactics were doing to Rike's profit margin? A. Yes.

Q. Because of your policy of meeting everybody's price you had to meet their prices and cut your profit when those things happened? A. Very definitely.

Q. And what your buyers were trying to do was to avoid that necessity so as to keep up their profit margins; isn't that right, sir? A. Yes, sir.

Q. And your divisional merchandise managers were very upset about that, and the buyers were told to do whatever was necessary to meet and beat the competition; isn't that true? A. Very definitely.

\* \* \* \* \* \*

Q. Well, now, didn't you testify as follows on your deposition?

Look at page 28, sir.

Have you got page 28, sir? A. Yes.

Q. Beginning at line 14:

"Question: And the buyers generally because of that"—that was the fact that they wanted to get the highest price without running the customers away—"because of that, operated under the principle that there would be less likelihood of their having to cut a price on a line of merchandise if their competition didn't carry the same lines?

"Answer: Yes."

A. That's very obvious, Mr. Goldman.

Q. "Question: And that by having an exclusive the buyers felt it would be easier for them to maintain their markup?" A. Yes.

Q. The answer, "Yes."

\* \* \* \* \* \*

Q. I will read you the question again:

"And it was not an uncommon practice for buyers to suggest or say openly, or suggest by implication, to suppliers, that if the suppliers sold the line which the buyers desired as an exclusive to the competition, that the buyer would himself no longer buy that line? Answer: I think it would be ill-advised on the part of a buyer.

"Question: Well, this did occur, did it not?

"Answer: Well, you have all kinds of buyers.

"Question: Well, it is a fact that it occurred, isn't that so?

"Answer: Probably, yes."

A. All right, we have the answer. I will agree to the statement.

\*    \*    \*    \*    \*    \*

The managerial policies described by Mr. Starling countenanced threats to withhold business to compel exclusive contracts. His testimony must be read as indicating that he knew that such acts were taking place.

It is my opinion that threats of economic retaliation for failure to give Rike's an exclusive or maintain one already given are actions which the jury could find to have been in restraint of trade and hence violations of Section 1 of the Sherman Act. Such threats could also have been found to be violative of Section 2's prohibition against attempts to monopolize. (I agree with my colleagues that no case was made out concerning actual monopoly.)

The policies Starling described were obviously long-standing ones applicable to periods both before Federated's purchase of Rike's and before the filing of the suit now on appeal. But his testimony must also be read as applicable up to his retirement which occurred well after the beginning of the period covered by the case at issue.

Since Starling's testimony must also be read as conceding that some of the coercive tactics produced exclusive contracts, there was, in my opinion, direct evidence from the highest possible authority in this case from which the jury could have found the existence of an illegal conspiracy. For this reason I have no problem with the District Judge's admission of hearsay evidence as to the methods employed by Rike's to secure exclusives. Hearsay evidence of statements made by a coconspirator in furtherance of the conspiracy are admissible when there is direct evidence to establish the conspiracy. United States v. United States Gypsum Co., 333 U.S. 364, 393, 68 S.Ct. 525, 92 L.Ed. 746 (1948); Logan v. United States, 144 U.S. 263, 309, 12 S.Ct. 617, 36 L.Ed. 429 (1892); Brown v. United States, 150 U.S. 93, 98, 14 S.Ct. 37, 37 L.Ed. 1010 (1893). See also 4 J. Wigmore, Evidence § 1079 (3d ed. 1940).

The District Judge in this case understood and followed established precedent in admitting or excluding hearsay. The care (and fairness) with which he approached this problem is illustrated in Volume I of the Appendix, pages 161a–167a.

Illustrative of the hearsay testimony quoting suppliers (or their named agents) pertaining to their reasons for not selling their product to Elder-Beerman are the following quotations. In each instance the witness is an Elder-Beerman buyer quoting the reasons given him by a supplier (usually a named salesman) as to why the supplier would not sell Elder-Beerman.

A. So I asked Mr. Skolnick why, and he told me that after due consideration he felt and his company felt that Beerman's was not the store to sell, that Rike-Kumler was the store to sell, and that when he went into Rike's he was informed by Richard Meyers—

Q. Richard Meyers, the same man that you mentioned being at these AMC meetings? A. Yes, sir.

Q. Go ahead. A. By Richard Meyers that he was very interested in

the line, and he evidently did buy it because I saw it there—that he was interested in the line and that he would buy it but that he did not want Beerman Stores to have the line if he was to buy it. So in his judgment he felt that Rike's—and his company felt that Rike's would be a better account, and seeing that they didn't want us to have it, he couldn't sell them, so he would just sell them. I was very upset and I asked him to please reconsider, and he said no, and that was it. (160a–161a).

* * * * * *

A. Abelson manufactured boys' clothing, suits and outerwear, and their trade name which was in the garment was Buddy, B-u-d-d-y, Buddy. And they were a very fine resource, upstairs resource, boys' clothing outerwear. And we carried Abelson, as well as the Rike-Kumler carried Abelson. And Mr. Ronnie Staller, who again was the representative for Abelson in this particular area, my salesman—

Q. You say your salesman, he was the salesman who called on you, you mean? A. Yes, right, the salesman that called on me.

—told me that he no longer could sell me some of the suits that I was buying. I asked him why couldn't he sell me the suits. And he explained to me that he had a discussion with Richard Meyers of Rike-Kumler and that Mr. Meyers did not want Beerman's to have the Buddy, or Abelson line, and after much discussion he pleaded with Mr. Meyers—he was able to offer me the concession that I could buy just the numbers that were not being carried by the Rike-Kumler Company. In other words, any number that he bought I was not permitted to buy; anything left over I could buy. (168a).

* * * * * *

Q. What took place there? A. Mr. Klinger and I had a conversation and I tried again to ask him to sell me his line of merchandise.

Mr. Klinger said that, as I said before, he was getting static from Rike's, and I asked what the big objection was that Rike's had with us carrying the Sioux-Mox. He said Rike's liked to carry the line exclusively because this way they could merchandise the line any way they wanted to and where they felt like it take an extra dollar on the merchandise without any fear of competition (213a).

* * * * * *

Sometime the following week I received a phone call from Mr. Pugh. He told me that he wanted to sell us, he made his living on commissions from sales, but he was in a bind, that Mr. Hooks wanted to have the line for Rike's exclusively, and did not want Mr. Pugh to sell the Van Eli line of shoes to the Bee-Gee Shoe Corporation. (223a).

* * * * * *

So in January of that year Mr. Heath called on us again to sell us a line of boots, and he related to us that when he told the Rike buyer, Mr. Bob Hooks, that he sold us the line, that Mr. Hooks became very upset and used profanity in reference to himself for selling us, and in reference to our operation, and our stores, and told him that he would pay through the nose for selling us the shoes.

And he also stated to me that he did take a cut in the orders from Rike-Kumler. (279a–280a).

* * * * * *

Q. Where was this meeting, do you recall? A. I believe it was in Chicago. And Mr. Glick told me that when he came to Dayton he called on Rike-Kumler and they decided to put in the shoes, and he—

Q. Put in what shoes? A. The Bandolino line.

Q. They were already carrying the Amalfi, is that it? A. Yes.

Q. Go ahead. A. And one of the conditions was that they would be the only account to carry the shoes in the

city. So he was sorry but he just wouldn't be able to sell us at that time. (293a).

\* \* \* \* \* \*

Q. Did the man who spoke to you say anything about the Rike-Kumler Company on that occasion? A. He said that he had pressure from the Rike-Kumler Company that if they continued to sell us that they would have to cut them out. (328a).

\* \* \* \* \* \*

Q. Will you relate what took place? A. He came into the store and told me that as much as they hated to do it, they were going to have to cut me off, that Federated had given an ultimatum that I could not continue to sell the Stearns & Foster mattresses; and that they would continue to service my account for three months, and during those three months I could buy what I needed and at the end of the three months I could place one order to balance my stock and that would be the end of our orders with Stearns and Foster. And that's the way it ended. (538–539a).

It is interesting to compare this testimony with the language of a 1964 Rike's Policy Statement to its managerial personnel. This statement was circulated, of course, well after the beginning of the period covered by this case and it may be significant that we have found no testimony as to coercive tactics thereafter:

We may, at the time we purchase an item or line from a resource do so on the understanding that we have an "exclusive". This must be strictly an understanding between the resource and ourselves. Under no circumstances may we ask that a specific competitor not be sold.

Whether in protection of an exclusive or otherwise, our department managers must understand that any attempt to influence or prevent resources from selling any merchandise to competitors is extremely dangerous and could very possibly provoke Antitrust investigation and action.

What has preceded may well represent the strongest possible presentation of Elder-Beerman's case, and, of course, there is much to the contrary. But on review of a jury verdict as to sufficiency of evidence, we are required to consider the most favorable evidence to the prevailing party which the jury obviously believed. Lavender v. Kurn, 327 U.S. 645, 652–653, 66 S.Ct. 740, 90 L.Ed. 916 (1946); Pittsburgh Plate Glass Co. v. United States, 260 F.2d 397 (4th Cir. 1958), aff'd, 360 U.S. 395, 79 S.Ct. 1237, 3 L.Ed.2d 1323 (1959); 5 C.J.S. Appeal & Error § 1562(4) (1958).

The evidence in this record, though far from conclusive, was sufficient in my judgment to support the jury's finding of liability on the part of appellants for an illegal conspiracy to restrain trade and attempt to monopolize.

DAMAGES

Although I would affirm the jury's verdict as to liability, I concur in reversal of the damage award and in remand of the case for rehearing of this issue alone.

I agree fully with what Judge Kent has written as to the damage aspect of the case, but I would like to add some emphasis.

The admissibility of expert witness testimony is committed to the discretion of the trial judge—a discretion as to which appellate courts are loathe to find abuse. Further, on damage proofs the courts are liberal in antitrust cases because of the difficulty plaintiffs have in securing precise figures. Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563, 51 S.Ct. 248, 75 L.Ed. 544 (1931). But as this court said in another antitrust case:

Judgments in anti-trust cases cannot be rendered on speculation or guesswork, even against a party who by his own wrong has precluded a more precise computation of damages. Bigelow v. RKO Radio Pictures, 327 U.S. 251, 264, 66 S.Ct. 574, 90 L.Ed. 652; Volasco Products Co. v. Lloyd A. Fry Roofing Co., 308 F.2d 383, 392

(C.A. 6), cert. denied, 372 U.S. 907, 83 S.Ct. 721, 9 L.Ed.2d 717. Associated Press v. Taft-Ingalls Corp., 340 F.2d 753, 769 (6th Cir.), cert. denied, 382 U.S. 820, 86 S.Ct. 47, 15 L.Ed.2d 66 (1965).

In this case, to a greater degree than I have ever seen in any appeal, damages rested upon "speculation and guesswork."

We have already noted that during all of the years involved here Elder-Beerman's operations were increasing notably both in total sales and in net profits. While this is not fatal to Elder-Beerman recovering antitrust damages, it does lend support to appellant's suggestion that specific proof of injury should be required.

Elder-Beerman relied for computation of damages, however, entirely upon an expert witness named Friedlander. Friedlander undertook to compute damages by a formula which seems to me to be without any basis in either this record or in reality.

Friedlander's damage computation started with the ratio between a specific Rike's department which had an exclusive name brand and compared its total sales, after deducting the exclusive sales, to the total sales of the comparable department of Elder-Beerman. He then multiplied Rike's sales of the exclusive name brand by the ratio of Elder-Beerman's total sales to Rike's sales minus this particular name brand. The figure thus arrived at he called "lost sales." This amounted to $14,309,632 when calculated against 63 of the lines which Friedlander employed.

As I understand Friedlander's logic, it is that the ratio of Elder-Beerman's capacity to sell goods to Dayton customers as compared to Rike's is properly shown by this comparison. Hence, Elder-Beerman should be held to have "lost" a similar percentage of sales of the Rike's exclusive brands which had been denied to it.

This theory is founded upon the totally unsupported assumption that each of Rike's "exclusives" were so unique as to be irreplaceable. If Rike's kitchen supply department had an absolute Dayton area monopoly on can openers, or its hardware store had an absolute monopoly on power saws, or its home furnishing department had an absolute monopoly on mattresses, then Friedlander's ratio would have a logical basis. Whoever wanted a can opener, a power saw, or a mattress would have to go to Rike's.

But actually Elder-Beerman is not complaining that it could not sell mattresses. It had Simmons mattresses and Serta mattresses, to name only two. Its complaint is that it did not have Stearns & Foster mattresses. While Stearns & Foster might or might not be more attractive to Dayton customers than Simmons or Serta, the comparison is not of the same order as where one department store sells mattresses and the other can't get any mattresses at all to sell.

Of more relevance to male judges is the shirt situation. Rike's had exclusives on Arrow shirts and on Hathaway shirts. But it did not have a monopoly on shirts; Elder-Beerman sold Manhattan shirts. This isn't to argue that the Arrow and Hathaway exclusives may not have done damage to Elder-Beerman. The point is that brand monopoly and product monopoly are entirely different and that absent proofs of brand irreplaceability, Friedlander's ratio (which underpins his entire testimony) is utterly without foundation.

It is true, of course, that Friedlander's next calculation gave some recognition to the fact that Elder-Beerman's customers might possibly be satisfied with a Manhattan shirt or a Simmons mattress. But this calculation appears to have rested if possible on even thinner air.

Friedlander described the origin of his "sharing" formula thus on cross-examination:

Where did that formula come from? A. My head.

Q. You made it up for this purpose? A. Let me explain it to you.

You see, when you are trying to think through a problem or a situation like this you come to a concept, and the concept can often be pictured in a graph, see. The graph is a picture of your concept.

Now, this is in creative thinking.

Q. Yes. A. Otherwise, when you have all these curves with formulae, they represent catenary arcs, and all that stuff. But in creative thinking you have a picture, you have a thought, a concept in your mind, and it can be pictured on a piece of paper in a graph. So you picture it and then you develop a formula to describe the picture and to finish it off the way you want it. And so you get a nice, smooth curve, and that puts everything on an orderly basis.

That doesn't give it an imprimatur, it doesn't make it, you know, holy writ. It is just—That's what it is.

Q. You drew this curve first? A. I drew the rough of that curve first. That was the picture I had in my mind.

Q. Then you said, What formula will express that curve?

A. That's right.

\* \* \* \* \* \*

Q. You think? A. I think that is pretty close, yes.

Q. Do you have any data whatever sir, that substantiates this particular curve? A. No.

Newton had no data about the center of forces in a sphere, and somebody made him hold up the mathematics for two years before he got it. It was a shame. He knew it, he knew it worked that way. We all know of such things. (1487–88a) (Page numbers refer to Appendix.)

Friedlander then undertook to calculate the peripheral loss of sales—these being sales arguably lost because cus-tomers who were seeking a top name brand did not come into the Elder-Beerman stores and hence did not buy other items in that store on that same visit. Here again, he employed a judgmental curve and derived a mathematical formula to fit it. By this method he added "peripheral lost sales" for a total lost sales estimate of $44,000,000 for the years 1962 through 1966. He then undertook by other arbitrary formulae to reduce this figure to lost profits and finally wound up with an estimate of some $7 million odd dollars of such lost profits.

While the jury obviously did not follow Friedlander all the way on this testimony, I cannot find justification for letting this theory of damage go to the jury.

Perhaps if there had been in this long controversy no way at all to relate Elder-Beerman's damages to established facts, even opinions like those referred to above might be admissible for want of better. But before this record was closed, Elder-Beerman's litigation had the direct result of securing the with-held merchandise from all of the offending suppliers except 12. Thus Elder-Beerman had records of years of sales experience during which a desired brand was withheld to compare with subsequent years of experience after the desired brand was on its shelves. Of course, these proofs were available by subpoena to Rike's and Federated also. But while they were contesting liability, it would hardly serve their purposes to prove any Elder-Beerman damages at all. And damages represent an essential part of any plaintiff's case.

On remand it should be possible through the pretrial proceedings suggested by Judge Kent to stipulate the comparisons suggested above.

No appellate issue is presented concerning the failure of the District Judge to instruct that the jury could not award damages to Elder-Beerman for such

wholly lawful exclusives as were granted by suppliers on the basis of their own sales policies unaffected by any coercion by Rike's and without intent to restrain trade or monopolize. The District Judge did, of course, give a careful instruction on the fact that the jury could not find liability as to Rike's on the basis of exclusives for which supplier policies were solely responsible. But it is entirely possible on this record that the jury found an illegal conspiracy between Rike's and a dozen coerced suppliers and still computed damages on testimony relating to 63 suppliers. The omission of a specific instruction on this point as to damages appears to me to be plain error. Fed.R.Civ.P. 51. It is an important omission which should be dealt with on retrial of damages.

For these reasons I believe the jury verdict of liability should be affirmed in favor of Elder-Beerman and the dollar judgment of damages should be vacated and remanded for retrial.

## ADDENDUM

Since my views on affirmance of the jury verdict as to liability have proved unpersuasive to my colleagues, this case (absent Supreme Court intervention) must be retried.

Without deviating from the opinions expressed above, I now record my vote to include the conspiracy to restrain trade issue in the new trial.

WILLIAM E. MILLER, Circuit Judge (concurring in part and dissenting in part).

A reversal in this case sets at naught a protracted and complex trial presided over by the District Judge with patience, fairness and ability. Nevertheless, considering the record as a whole and the theories on which the case was presented to the jury with directions to return a general verdict, this result appears to me to be inevitable.

One such theory was the plaintiff's claim that the proof under Sec. 1 of the Sherman Act established a horizontal boycott in that Rike's and the suppliers combined and conspired with one another to effect a boycott of plaintiff. Thus the court specifically charged the jury:

The plaintiffs also charge that Rike's and suppliers that have refused to sell to plaintiffs have combined and conspired to effect a boycott of plaintiffs in violation of the Sherman Act. I have instructed you on the particular meaning of the words "combination", and "conspiracy" as they are used in antitrust cases.

The definition of the word boycott may be stated:

"A boycott is an agreement between manufacturers whereby acting together, they agree that none of them will deal with a particular buyer or retailer."

A boycott is a particular kind of conspiracy. It is a collective refusal to deal by agreement among competing sellers or among competing buyers. It may be a collective refusal to buy from a particular manufacturer as a result of an agreement among competing buyers. Or it may be a collective refusal to sell to a particular customer as a result of an agreement among competing sellers.

What would be boycott, and what would be a violation of the Sherman Act, would be an agreement among several manufacturers whereby they all agree with each other that none of them will sell to a particular buyer. We call an agreement among manufacturers a horizontal agreement, because it is among persons who are at the same level in the distribution process. I am instructing you that a horizontal agreement among manufacturers whereby each agrees with the others not to sell to a particular buyer would be unlawful boycott.

I direct that this explanation is what should guide you in determining whether a conspiracy of the kind alleged has been established by the evidence.

On appeal, the plaintiff advances the same alternative theory that there was

sufficient evidence from which the jury could have concluded that there was a concert of action on the part of the suppliers, together with Rike's, to boycott Elder-Beerman. It is, therefore, argued that there was a per se liability with respect to all of the alleged conspirators on the basis of the ruling in Klor's, Inc. v. Broadway-Hales Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). A careful examination of the record, however, in this case fails to sustain this theory of a Sec. 1 violation. The only reference to suppliers allegedly engaged in such a concert of action were the silver suppliers, members of the silversmiths guild. While there was evidence that a number of the sterling silver suppliers refused to sell to the plaintiff, there is no substantial evidence that there was any communication or agreement between them. In Klor's the complaint alleged that the manufacturers and distributors of various products conspired among themselves and with a chain of department stores either not to sell to petitioner or to do so at discriminatory prices and on highly unfavorable terms. The defendant filed a motion for summary judgment and the factual allegations of the complaint were not disputed. In consequence, the court held that the complaint was sufficient to establish a horizontal boycott and per se liability on the part of the defendant. In the present case, as noted, the evidence is clearly insufficient to sustain such a theory of liability or any concert of action on the part of the suppliers either among themselves or with Rike's to boycott the plaintiff, or to eliminate it as a competitor in the market.

The most that the evidence in this case could justify would be a finding of several separate and distinct agreements between Rike's and one or more suppliers (vertical confinements). But assuming that the jury could have so found, the case would still fall short of a Sec. 1 violation, since there is no substantial proof that any such separate or distinct agreement had as its purpose or effect an unreasonable restraint of trade or the elimination of Elder-Beerman as a competitor in the Dayton market.

Exclusives granted by suppliers to a retailer are not per se violative of the antitrust laws. United States v. Arnold Schwinn & Company, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967). The mere fact that a number of exclusives were granted by separate suppliers, acting individually, to the same dealer, even though that dealer was dominant in the particular market, is not enough to invalidate the exclusives under a Sec. 1 theory of liability. The plaintiff and the district court rely upon Poliafico v. United States, 237 F.2d 97 (6th Cir.1956), cert. denied 352 U.S. 1025, 77 S.Ct. 590, 1 L.Ed.2d 597 (1957), in support of the proposition that "the fact that one such supplier did not have dealings with another supplier does not matter." The clearly distinguishing factor, however, is that in *Poliafico* each conspirator had knowledge of the overall unlawful plan of the conspiracy to sell narcotics, although the conspirators did not have knowledge of the actual conduct or the existence of their co-conspirators. In the case before us the record is wholly insufficient (even to raise a jury issue) that the suppliers had knowledge of an unlawful plan (if there was one) to set up a system of exclusives with Rike's which had the unlawful purpose of imposing an unreasonable restraint upon trade.

Since I agree with Judge Kent that the alleged Sec. 1 violation was not proved, it follows that the general verdict of the jury was of no effect and that the judgment in favor of the plaintiff must be reversed. Sunkist v. Winckler & Smith, 370 U.S. 19, 82 S.Ct. 1130, 8 L.Ed.2d 305 (1962); Volasco Products Co. v. Lloyd A. Fry Roofing Co., 308 F.2d 383, 390 (6th Cir.1962).

However, as I read Judge Kent's opinion, on remand the plaintiff may be permitted (possibly after some amendments to the complaint) to retry the case on all three theories of liability. As we find that the Sec. 1 theory was not established by the proof, it is my view that

plaintiff has had its day in court on this issue and that it should not be permitted another trial. Also, since we find that the plaintiff abandoned the monopolization theory it has no right to a retrial of that issue. It is my opinion that the district judge should have granted the defendant's motion n.o.v. both with respect to the alleged Sec. 1 violation and as to the claim of monopolization under Sec. 2.

I further believe that the evidence was sufficient to take the issue of attempt to monopolize under Sec. 2 of the Sherman Act to the jury and that the case should be remanded for re-trial on that issue alone.[1] I agreed that pretrial conferences should prove to be helpful in the District Court in delineating the questions which might arise during the trial.

1. An examination of the plaintiff's brief from page 53 to page 62 reveals that its position with respect to the monopolization issue under Sec. 2 of the Sherman Act is at best equivocal and ambivalent. To me it is misleading. The brief contains the quotations referred to by Judge Kent in his opinion in which it clearly appears that the plaintiff abandoned the monopolization theory. Yet almost in the same breath the plaintiff argues in its brief that the Court's charge on monopolization was not prejudicial and that there was sufficient proof of monopolization and of the relevant market. In these circumstances, I agree with Judge Kent that the plaintiff should be held to have abandoned this theory of liability.